**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,**

v.

**Michael A. MAIO and Patricia C. Ladavac, Defendants–Appellants.**

Nos. 94–1233, 94–1234.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 6, 1994.

Decided March 21, 1995.

Jacob H. Stillman, Lucinda Burwell, Brian D. Bellardo (argued), S.E.C., Office of the Gen. Counsel, Washington, DC, for plaintiff-appellee.

Ronald E. Elberger, George T. Patton, Jr. (argued), Bose, McKinney & Evans, Indianapolis, IN, David W. Mernitz, Indianapolis, IN, for Michael A. Maio.

Ronald E. Elberger, George T. Patton, Jr. (argued) Bose, McKinney & Evans, Indianapolis, IN, for Patricia C. Ladavac.

Before COFFEY, MANION, and KANNE, Circuit Judges.

MANION, Circuit Judge.

The Securities and Exchange Commission brought a civil enforcement action against Michael Maio ("Maio"), Patricia C. Ladavac ("Ladavac"), and others, alleging that they violated federal securities laws by trading on the basis of material non-public information. The matter was tried before the district court which agreed with the SEC, entered judgment against the defendants, and assessed fines and penalties. Maio and Ladavac appeal. We affirm the district court.

## I. Facts

In June and July of 1988, Louis P. Ferrero ("Ferrero") the chairman, president, and chief executive officer of Anacomp, Inc. ("Anacomp") told Michael Maio that Anacomp was negotiating a tender offer for stock in Xidex Corporation ("Xidex"); Maio told Patricia Ladavac;[1] and both Maio and Lada-

---

1. On June 14, 1993, Ladavac changed her name from Patricia C. Ladavac to Patricia Barclay Chandler. However, the parties, including Ms. Chandler, continue to use her former name in these proceedings, and so will this court.

vac traded on the basis of this information.[2] We begin with a brief review of the relationships between these people because those relationships help establish the nature of Ferrero's disclosure, and ultimately the liability of Maio and Ladavac.

### A. The Relationships Between Ferrero, Maio and Ladavac

Some time in the 1970's Ferrero and Maio met each other through their mutual friend Dr. Ronald Palamara ("Palamara"), the founder of Anacomp, a large publicly-held company that specializes in information services. Maio knew Palamara from childhood; they grew up together in Indianapolis and remained friends until Palamara died in 1985. Ferrero met Palamara in the mid 1970's when Ferrero sold his business to Anacomp and took a position there. Ferrero soon became close friends with Palamara.

Over the years of their mutual friendship, Palamara, Maio, and Ferrero traveled to Las Vegas together to gamble or attend prize fights and they regularly attended each other's family weddings. But perhaps the best evidence of their close friendship is that shortly before Palamara died in 1986 he asked Ferrero to look after three people for him: his younger son, his long-time secretary, and Michael Maio. As Palamara put it: "So now [that] you are in the big business world, don't forget about Michael." According to Ferrero, he had no problem accepting this commitment because he was grateful to Palamara for his leading role in having Anacomp purchase his family company and for following Maio's recommendation that Ferrero succeed Palamara as President of Anacomp. Of course, he also considered Maio to be a good friend.

Ferrero kept his commitment. In 1987 Ferrero loaned Maio $250,000 to finance construction at an amusement park owned by Maio's family and the Palamara estate, which was financially vulnerable at this time. Although this was the largest personal loan Ferrero ever made, Maio signed no promissory note, paid no interest, and gave no mortgage. According to Ferrero, he saw this loan as an opportunity to help both Maio and Palamara's family.

Ferrero also helped Maio by providing information relevant to Maio's speculation in the stock market. For example, in August of 1987 Anacomp entered a bidding contest to acquire Endata Corporation ("Endata"). When Endata's management privately advised Ferrero that it had decided to accept a competing offer and would soon be acquired, Ferrero passed this non-public information on to Maio who called his broker. Both Maio and his broker purchased Endata stock and, when the tender offer was announced the next day, Maio sold the stock for about a $100,000 profit.

Both Maio and Ferrero knew Patricia Ladavac. By 1988 Maio and Ladavac had been good friends for over twenty years and Maio staked Ladavac on many investment projects. For example, Maio loaned Ladavac over $248,000 between August 1987, and May 1989. All of the loans were informal and interest-free. Ladavac met Ferrero through Maio. She knew that Maio and Ferrero were good friends, and she knew Ferrero's position at Anacomp. In fact, when Anacomp was interested in purchasing Endata, Ladavac arranged a meeting between Ferrero and one of Endata's directors. Against the backdrop created by these close friendships, we consider the securities trading that gave rise to this case.

### B. Anacomp's Tender Offer for Xidex and the Illicit Trading

By June of 1988, Anacomp and Xidex had enjoyed extensive dealings since the 1970's. Xidex manufactures microfilm and related products. Anacomp bought millions of dollars worth of microfilm and other products from Xidex annually. For years the two companies had talked of combining because their operations were complementary.

These discussions became more serious in 1988, however, because Xidex's financial condition was deteriorating. During this period

---

**2.** Maio also tipped other defendants who are not a party to this appeal, but it should be noted that the conduct of these other defendants evidenced the same pattern of tipping and trading described here.

Xidex retained Goldman Sachs for financial advice. After conducting an investigation, Goldman Sachs indicated that some joint marketing, merger or other arrangement with Anacomp appeared feasible and desirable. Thus, in February of 1988, Xidex invited Anacomp to acquire Xidex. Ferrero was initially taken aback by this proposal because Xidex was a much larger corporation than Anacomp. But by March 1988 he expressed interest and told Xidex that they needed to start a due diligence investigation. Still, no serious discussions about the acquisition took place at that time.

As Xidex's financial condition worsened, however, it took steps to secure a firm commitment from Anacomp. On June 2, 1988 Xidex's board authorized its president, Bert Zaccaria ("Zaccaria"), to ask Ferrero whether he was interested in acquiring Xidex and, if so, to check with his financiers to determine Anacomp's offering price for Xidex stock. By the next day, Ferrero and Zaccaria had arranged to meet in Las Vegas on June 6–7, 1988. Before that meeting, Ferrero called the lawyers and investment bankers whom he had used in prior Anacomp acquisitions.

When Ferrero met with Zaccaria to discuss Anacomp's acquisition of Xidex on June 6, 1988, Zaccaria, Ferrero, and Maio were all staying in the same Las Vegas hotel. This was no coincidence because Maio and Ferrero had planned to meet in Las Vegas for gambling and socializing on June 6, even before Ferrero scheduled his meeting with Zaccaria. Ferrero and Maio saw each other several times over the course of this weekend.

It was after these meetings that the trading at issue began. More specifically, Maio called Ladavac before he left his hotel in Las Vegas, and later Maio called his broker from the Las Vegas airport. Shortly after this call Maio's broker bought 5,000 shares of Xidex for Maio's account. Thirty minutes after Maio's order, Ladavac, who had never purchased stock in Xidex before, also bought 5,000 shares of Xidex and placed an order to sell 300 shares of Anacomp.[3] The next day,

on June 8, Maio bought an additional 10,000 shares of Xidex and Ladavac sold 1,700 more shares of Anacomp. Later on June 23, 1988, Ladavac purchased 5,000 shares of Xidex and sold 4,000 shares of Anacomp.

Immediately after this June 6–7, 1988 meeting, both Anacomp and Xidex took steps to pursue the acquisition. On June 8, the day after Ferrero returned from his meeting with Zaccaria in Las Vegas, he assembled Anacomp's financial, legal, and investment banking people to coordinate Anacomp's due diligence investigation of Xidex. On that very day, Anacomp submitted a preliminary due diligence request. On June 10, Xidex's board met and discussed prices which would make the sale of Xidex acceptable. By June 14, 1988, Xidex and Anacomp had agreed on a price for the tender offer subject to confirmation upon completion of Anacomp's due diligence investigation. On that day, the companies signed a confidentiality agreement and met with their investment bankers in secret to begin exchanging highly sensitive information. The parties planned to sign an acquisition agreement on Friday, July 8, or Monday, July 11, 1988.

On July 6, 1988 Ferrero was preparing to fly to California to meet with Xidex in connection with the acquisition agreement. On that same day, Maio placed a 17–minute phone call to Ferrero. One minute after this call ended, Maio purchased 10,000 more shares of Xidex stock. Earlier that day, Ladavac had purchased 5,000 shares of Xidex and sold 2,000 shares of Anacomp.

Ferrero flew to California on July 7, 1988, for his confidential meeting with Xidex the next day. Maio placed a 14–minute phone call to Ferrero at his hotel on the morning of July 8, and shortly after this call Maio placed two orders to buy a total of 30,000 shares of Xidex. Later that same day Maio purchased 2,500 more shares of Xidex and sold some 22,800 shares of Anacomp. Ladavac bought 5,000 shares of Xidex minutes after Maio got off the phone with Ferrero and, shortly thereafter, sold 3,000 shares of Anacomp. Later this same day Maio called Ladavac

---

**3.** When a tender offer is announced, usually the price of the target company rises and the price of the offeror falls or remains the same. See *SEC v. Materia,* 745 F.2d 197, 199 (2d Cir.1984).

from his car and she bought 5,000 more shares of Xidex and sold 5,000 more shares of Anacomp.

On July 10, Ferrero flew back to Indianapolis so that the next day he could preside over the Anacomp board meeting scheduled for the consideration and approval of the tender offer. Maio called Ferrero at his Indianapolis hotel just before 7 a.m. on Monday, July 11, and, starting an hour and a half later, Maio bought 35,000 shares of Xidex and sold 37,200 shares of Anacomp in a series of seven transactions.

On Tuesday, July 12, 1988, Anacomp and Xidex for the first time publicly announced Anacomp's planned tender offer. When the markets opened Xidex stock jumped over 26% and Anacomp stock dropped over 13%. Immediately after the announcement Maio and Ladavac sold all of the Xidex stock they had purchased since Maio's meeting with Ferrero in Las Vegas on June 6, 1988. Maio had purchased 80,000 shares of Xidex for $527,000 and made a profit of $211,000. He also sold $60,000 shares of Anacomp prior to the announcement thereby avoiding losses of $66,250. Ladavac had purchased 25,000 shares of Xidex for some $155,000 and made a profit of $78,750. She had also sold 16,000 shares of Anacomp before the announcement thereby avoiding losses of $15,750.

The trading of Maio, Ladavac, and others attracted the SEC's attention, and it began an investigation. During that investigation, Ferrero, Maio, and Ladavac were questioned by the SEC, and ultimately the SEC brought this civil enforcement action against each of them, and others. The day after the SEC filed suit, Ferrero consented to the entry of judgment against him without admitting or denying the allegations in the SEC's complaint. Pursuant to that judgment he agreed to pay a penalty of over $275,000. Maio and Ladavac denied any wrongdoing, and the case went to trial.

At trial, Maio and Ladavac denied giving or receiving tips and claimed that their trading was based on information available to investors at large. Maio testified that he ordered Xidex stock when leaving Las Vegas because his broker had called him there to recommend the purchase. But Maio's broker testified that he had never recommended the stock. Maio also claimed that he was in Florida during July and denied having made any calls to Ferrero, Ladavac, and his stockbrokers during that time. But the district court found that Maio had made these calls.[4] For her part, Ladavac denied receiving any tip from Maio and testified that she bought Xidex because a price movements chart prepared by a co-worker indicated Xidex stock was desirable. But that co-worker testified that his chart did not give a "buy" signal for Xidex at the time of Ladavac's trades.

After an extensive bench trial the district court entered judgment against Maio and Ladavac. In pertinent part, the district court found that information about the June 6–7 meeting between Ferrero and Zaccaria concerning the contemplated tender offer was material non-public information, and further, that the June 6–7 meeting was a substantial step by Anacomp towards commencing its tender offer for Xidex. The court also found that Ferrero misappropriated and gifted confidential information about this meeting to Maio, who then tipped Ladavac. The district court found that Maio and Ladavac had a derivative duty to disclose the material non-public information in their possession, because they knew that Ferrero's disclosure was improper, and that they breached this duty when they sold and bought shares in Anacomp and Xidex on the basis of that information. As a result, the district court found that their sales of stock in Anacomp

---

4. On appeal, Maio claims that this finding is clearly erroneous, but we disagree because Maio's explanations for these calls defy the imagination. Maio's claim that his son made the calls from his car phone by random speed-dialing makes no sense given: (1) the pattern of calls to Ferrero, Ladavac, and his stock brokers, (2) the length of the calls, and (3) the fact that the hotel phone numbers of Ladavac and Ferrero were not on the speed dial. And the airline has no record of his alleged flight to Florida, although they do have a record of his wife's flight, and those records indicate she flew alone. Similarly, his claim to have called his stock broker from Florida by using rolls of quarters is totally at odds with his clearly evidenced pattern of utilizing his credit card to make calls when away from home. If anything, Maio's ability to advance these arguments provides a basis for the district court's finding that his testimony was unworthy of credence.

violated §§ 10(b)[5] and 14(e)[6] of the Exchange Act, section 17(a)[7] of the Securities Act, and Rules 10b–5[8] and 14e–3[9] promulgated thereunder; it also found that their purchases of Xidex stock violated §§ 10(b), and 14(e) of the Exchange Act, and Rules 10b–5 and 14e–3. The district court entered judgment against the defendants and assessed fines and penalties. Maio and Ladavac appealed.

## II. Analysis

On appeal, Maio and Ladavac advance several challenges to their convictions. With respect to their convictions under § 10(b), Rule 10b–5, and § 17(a), Maio and Ladavac assert that they had no fiduciary duty to Anacomp or Xidex; therefore, they argue, they had no duty to disclose or abstain from trading in the stock of those corporations and their trades were perfectly legal. With respect to their convictions under § 14(e) and Rule 14e–3, they assert that the SEC exceeded its statutory authority when, by means of that Rule, it created a duty to disclose material non-public information even if there is no fiduciary relationship between the parties to a transaction. Therefore, they argue Rule 14e–3 is void and their convictions under that rule must be set aside. They also argue that Anacomp did not take a "substantial step" towards commencing its tender offer for Xidex until the parties executed a confidentiality agreement on June 14, 1988. Any trading before that date would not violate Rule 14e–3, which only prohibits trading after an offeror has taken a substantial step towards commencing its tender offer. For the same reason, they argue that any information they received prior to June 14, 1988 was not "material" within the meaning of Rule 10b–5 and Rule 14e–3 which only proscribe trading on the basis of material non-public information.

*A. Violations of § 10(b), Rule 10b–5, and § 17(a)*

*1. Statutory sections and background.*

The district court found that Maio and Ladavac violated Section 17(a) of the Securi-

ties Act and Section 10(b) of the Exchange Act, as well as Rule 10b–5. Section 10(b) makes it unlawful "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe ..." 15 U.S.C. § 78j(b). Thus, a practice must contravene a rule promulgated by the SEC in order to violate § 10. *SEC v. Clark*, 915 F.2d 439, 443 (9th Cir.1990). Pursuant to its statutory authority, the SEC has promulgated Rule 10b–5 which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5.

Section 17(a) of the Securities Act provides:

It shall be unlawful for any person in the offer or sale of any securities ...

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

---

**5.** *See* 15 U.S.C. § 78j(b).

**6.** *See* 15 U.S.C. § 78n(e).

**7.** *See* 15 U.S.C. § 77q(a).

**8.** *See* 17 C.F.R. § 240–10b–5.

**9.** *See* 17 C.F.R. § 240–14e–3.

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a).

As applied in this case, the proscriptions contained in § 10(b), Rule 10b–5, and § 17(a) are substantially the same. *SEC v. International Loan Network, Inc.*, 770 F.Supp. 678, 694 (D.D.C.1991), *aff'd* 968 F.2d 1304 (D.C.Cir.1992); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 531 (7th Cir.1985) (equating elements of claim under Rule 10b–5 and § 17(a)); *U.S. S.E.C. v. Lauer*, 864 F.Supp. 784, 793 (N.D.Il. 1994) (same). The principal difference is that § 10(b) and Rule 10b–5 apply to acts committed in connection with a *purchase or sale of* securities while § 17(a) applies to acts committed in connection with an *offer or sale* of securities. *International Loan Network, Inc.*, 770 F.Supp. at 694. As we have both situations before us, we treat these sections together.

 Trading on the basis of material nonpublic information violates these sections where the trading arises "in connection with" a breach of a fiduciary duty. *See Dirks v. SEC*, 463 U.S. 646, 663, 103 S.Ct. 3255, 3266, 77 L.Ed.2d 911 (1983); *Chiarella v. U.S.*, 445 U.S. 222, 232–36, 100 S.Ct. 1108, 1116–19, 63 L.Ed.2d 348 (1980); *SEC v. Cherif*, 933 F.2d 403, 410 (7th Cir.1991). Currently there are two theories under which a breach of fiduciary duty can be established such that a violation of Rule 10b–5 arises: (1) classical theory, and (2) misappropriation theory. *Cherif*, 933 F.2d at 408–09. "Under the classical theory, a person violates [Rule 10b–5] when he or she buys or sells securities on the basis of material, non-public information and at the same time is an insider of the corporation whose securities are traded." *Id.* at 408. Under misappropriation theory a person violates Rule 10b–5 by "misappropriating and trading upon material information entrusted to him by virtue of a fiduciary relationship...." *Id.* at 410.

 The relationship between the corporation whose stock is traded and the person who breaches a fiduciary duty by trading or tipping determines which theory is applied. Classical theory applies to trading by *insiders* (or their tippees) in the *stocks of their own corporations. Cherif*, 933 F.2d at 408. Misappropriation theory "extends the reach of Rule 10b–5 to *outsiders* [or their tippees] who would *not ordinarily* be deemed *fiduciaries of the corporate entities in whose stock they trade.*" *Id.* at 409. Thus, under misappropriation theory one need not be an "insider" of the corporation whose stocks are traded in order for that trading to violate Rule 10b–5.[10] Instead, the misappropriation of material non-public information from its lawful possessor is regarded as a sufficient breach of fiduciary duty "in connection with" the purchase or sale of a security to justify liability under Rule 10b–5. *Id.* at 410.

In this case, Ferrero's tipping implicates both classical theory and misappropriation theory. Classical theory is implicated by the sales of *Anacomp stock*, because Ferrero was an insider of the corporation whose stocks were traded. Misappropriation theory is implicated by the purchases of *Xidex stock* because, although Ferrero was not an insider of that corporation, it was Ferrero's misappropriation of information from Anacomp concerning its upcoming tender offer for Xidex that led to this trading.

With this background in mind we turn to the principal challenge that Maio and Ladavac have raised to their convictions under § 10(b), Rule 10b–5, and § 17(a). Here, Maio and Ladavac argue that they had no fiduciary duty to Anacomp or Xidex where their failure to disclose material non-public information prior to trading in the stocks of those corporations would breach a fiduciary duty. Therefore, they insist they did not violate § 10(b) and Rule 10b–5, or § 17(a). In response, the SEC argues that Maio and Ladavac had a *derivative duty* not to trade in the stocks of Anacomp and Xidex because Ferrero breached his fiduciary duty to Anacomp when he misappropriated and gifted material non-public information to them and

---

**10.** Indeed, it is a commonplace that the term "insider trading" is a misnomer. *See, e.g.*, "Report of the Task Force on Regulation of Insider Trading," 41 *Business Lawyer* 223, 224 (1985).

they knew that Ferrero's disclosure was improper. Thus, the issue presented is whether Maio and Ladavac had a *derivative duty* to Anacomp which they violated when they bought and sold stock in Anacomp and Xidex on the basis of information provided by Ferrero.

### 2. Tippee liability of Maio and Ladavac for trading in Anacomp stock.

■ With respect to their trading in the Anacomp stock, the SEC argues that Maio and Ladavac had a *derivative* duty to Anacomp under *Dirks v. Securities and Exchange Commission,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), and we agree. In that case, the Supreme Court explained that:

[A] tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material non-public information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach.

*Id.* at 660, 103 S.Ct. at 3264. Put another way, a tippee has a derivative duty not to trade on material non-public information when the disclosure of information is *improper* and the tippee knows or should know that this is the case. *Id.* at 659–60, 103 S.Ct. at 3263–65. "Absent a breach by the insider there is no derivative breach." *Id.* at 662, 103 S.Ct. at 3265.

■ Whether an insider's disclosure breaches his fiduciary duty to his corporation, and is therefore improper, depends largely upon the purpose for the disclosure. *Id.* at 662, 103 S.Ct. at 3265–66. An insider's disclosure is improper when corporate information, intended to be available only for corporate purposes, is used for personal advantage. *Id.* at 654, 662, 103 S.Ct. at 3261, 3265–66. Absent a legitimate purpose for a disclosure, the test is whether the disclosure will benefit the insider either directly or indirectly. *Id.* at 663, 664, 103 S.Ct. at 3266, 3266. This test reflects the purpose of insider trading rules, which is to prevent the use of inside information for personal advantage. *Id.* The theory is that by disclosing informa-

tion selectively the insider is, in effect, selling the information to its recipient for things of value to himself. *Id.* at 664, 103 S.Ct. at 3266. (quotations and citations omitted). As the Court wrote:

There are objective facts and circumstances that often justify such an inference. For example, there may be a relationship between the insider and the recipient that suggests a quid pro quo from the latter, or an intention to benefit the particular recipient. *The elements of fiduciary duty and exploitation of non-public information also exist when an insider makes a gift of confidential information to a trading relative or friend. The tip and trade resemble trading by the insider himself followed by a gift of profits to the recipient.*

*Id.* (emphasis supplied). Absent such improper disclosure by the tipper, a *tippee* is not liable, because the tippee's duty is derivative. *Id.* at 659–60, 103 S.Ct. at 3263–65.

■ Maio and Ladavac argue that Ferrero's disclosure was not improper because he did not receive any direct or indirect personal benefit as a result of his tip. Therefore, the argument goes, they did not have any derivative duty to Anacomp. But the district court found that Ferrero's disclosure was an improper gift of inside information to Maio, a trading friend, *see Dirks,* 463 U.S. at 665, 103 S.Ct. at 3267 and the evidence supports the district court's finding. Ferrero met with or phoned Maio on a number of occasions; shortly thereafter Maio and Ladavac began dumping Anacomp stock and buying Xidex stock. This pattern of meetings or phone calls and trading supports the district court's finding that Ferrero gifted material non-public information concerning Anacomp's tender offer to Maio. Indeed, the record shows that Ferrero's tipping was just one of many favors that he has done for Maio through the years by reason of their friendship.

Significantly, Ferrero admitted that he had a duty to keep this information confidential, and neither Ferrero, Maio nor Ladavac have ever offered a legitimate purpose for the disclosures at issue. Instead, they merely denied that any disclosure took place; but the district court rejected this defense for

obvious reasons. Absent some legitimate reason for Ferrero's disclosure, however, the inference that Ferrero's disclosure was an improper gift of confidential corporate information is unassailable. After all, he did not have to make any disclosure, so why tell Maio anything? *Cf. SEC v. Lund*, 570 F.Supp. 1397 (C.D.Cal.1983) (Lund had no *derivative duty* where corporate insider disclosed material information while asking Lund, as chief executive officer, president and chairman of the board of Verit Industries, whether Verit Industries would provide $600,000 in venture capital); *SEC v. Switzer*, 590 F.Supp. 756 (W.D.Okl.1988) (corporate insider did not breach fiduciary duty to corporation when he disclosed material non-public information to wife while seated in grandstands of high school track field so she could arrange child care, and therefore, coach who overheard disclosure and traded on this information had no derivative duty to disclose or abstain before trading). After *Dirks* it is clear that Ferrero could not have made these trades and then gifted the profits to Maio. *Id.* at 664. By the same token, Ferrero cannot gift these profits indirectly by giving Maio the information so that Maio can make the trades.

■ Thus, Maio had a derivative duty not to trade Anacomp stock on the basis of the material non-public information provided by Ferrero, if he knew or should have known that Ferrero had provided this information in violation of his fiduciary duty to Anacomp. *Dirks*, 463 U.S. at 661. The district court found that Maio knew that Ferrero's disclosure was improper but traded in Anacomp stock just the same, and that finding is not clearly erroneous.[11] Maio knew Ferrero's privileged position at Anacomp—after all he had recommended Ferrero for the job. Ferrero met with or phoned Maio on a number of occasions; shortly thereafter Maio and Ladavac began selling Anacomp stock and buying Xidex stock. Maio knew that Ferrero had given him inside information and promptly moved to exploit his advantage. Maio's derivative duty—and his trading in breach of that duty—are beyond cavil.

So are Ladavac's. The district court found that Ladavac had received the material non-public information disclosed by Ferrero and knew that the disclosure was improper. That finding is also supported by substantial evidence and is certainly not clear error. Ladavac knew that Ferrero and Maio were friends, and she knew that Ferrero held an important position at Anacomp. And whatever speculation was present in the market, Ladavac did not begin buying Xidex until June 7, 1988, after speaking with Maio, who was in Las Vegas with Ferrero. Ladavac's trading further corroborates this inference: she spent some $155,000 to buy Xidex stock on margin when her 1988 income was only $11,000 and she had virtually no liquid assets. Clearly she regarded this tip as extraordinarily valuable and reliable. Ladavac mistakenly argues that she had no duty to Anacomp because she did not know that *Maio* had a fiduciary duty to Anacomp or that Maio's tip violated that duty. But Ladavac's duty derives from Ferrero, not Maio. *See Dirks*, 463 U.S. at 661, 103 S.Ct. at 3265 ("Tippee responsibility must be related back to insider responsibility by a necessary finding that the tippee knew the information was given to him in breach of a duty by a person having a special relationship to the issuer not to disclose the information . . ."); *U.S. v. Victor Teicher & Co., L.P.*, 785 F.Supp. 1137, 1150 (S.D.N.Y.1992) (second-tier tippee properly held liable where he knew disclosure was improper); *SEC v. Musella*, 748 F.Supp. 1028, 1038 (S.D.N.Y.1989) *aff'd* 898 F.2d 138 (2nd Cir.1990) ("the issue is whether a tippee, wherever he stood in a chain of tippees, 'either knew or should have known that he was trading on improperly obtained non-public information.' ").

### 3. Tippee liability of Maio and Ladavac for trading in Xidex stock.

■ The district court also found that Maio and Ladavac violated § 10(b) and Rule 10b–5 when they purchased stock in Xidex on the basis of the material non-public informa-

---

11. This duty ran to both the present shareholders of Anacomp and those who became shareholders when they bought shares from Maio and the others. *See Chiarella v. U.S.*, 445 U.S. 222, 227 n. 8, 100 S.Ct. 1108, 1114 n. 8, 63 L.Ed.2d 348 (1980).

tion misappropriated from Anacomp by Ferrero. Under misappropriation theory a person violates § 10 and Rule 10b–5 by "misappropriating and trading upon material information entrusted to him by virtue of a fiduciary relationship ..." *Cherif*, 933 F.2d at 410. The district court found that Ferrero breached his fiduciary duty to Anacomp by his misappropriation and disclosure of material non-public information concerning Anacomp's tender offer to Maio and, for the reasons given above, that finding is certainly not clearly erroneous.[12]

Given Ferrero's misappropriation, Maio and Ladavac had a derivative duty to Anacomp if they knew or should have known that Ferrero's disclosure was improper. *See U.S. v. Libera*, 989 F.2d 596, 600 (2d Cir.1993) (applying the knew or should have known standard from *Dirks* in misappropriation context); *SEC v. Musella*, 748 F.Supp. at 1038 (same). The district court found that Maio and Ladavac had a derivative duty to the shareholders of Anacomp because they knew that Ferrero's disclosure was improper, and breached that duty by their trading in the stock of Xidex. For the reasons given above, those findings are supported by substantial evidence; they are certainly not clearly erroneous.

### B. Liability of Maio and Ladavac for Their Violations of Rule 14e–3

■ The district court also found that Maio and Ladavac had violated § 14 and Rule 14e–3 by trading in the stock of Anacomp and Xidex. Section 14(e) of the Exchange Act provides

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer.... The [SEC] shall, for the purposes of this subsection, by rules and regulations, define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative. 15 U.S.C. § 78n(e).

Pursuant to this grant of authority, the SEC has promulgated Rule 14e–3 which provides in relevant part:

> (a) If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive, or manipulative act or practice within the meaning of section 14(e) of the [Exchange] Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:
>
> (1) The offering person,
>
> (2) The issuer of the securities sought or to be sought by such tender offer, or
>
> (3) Any officer, director, partner, or employee or any other person acting on behalf of the offering person or such issuer,
>
> to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or ex-

---

12. Trading in the target corporation's stock can affect stock prices, and therefore, typically suffices to establish misappropriation. *See, e.g., S.E.C. v. Clark*, 915 F.2d 439, 453 (9th Cir.1990) ("There is no question that the victim of the misappropriation traded in [the target's] stock and thus was defrauded by the trading activities of [the insider] and his tippees."); *U.S. v. Newman*, 664 F.2d 12, 17–18 (2d Cir.1981) ("misappropriators wronged acquiring corporation by trading in the stock of target's shares because takeover plans were keyed to target company stock prices fixed by market forces, not artificially inflated through purchases by purloiners of confidential information."). *Rothberg v. Rosen-*

*bloom*, 771 F.2d 818, 822 (3d Cir.1985) ("In this case [the insiders] were fiduciaries of the [the acquiring corporation] ... and owed that corporation a duty not to disclose secret information which would cause others to buy [the target corporations's] stock, thereby making it more difficult for [the acquirer] to consummate a merger on favorable terms."), *rev'd on other grounds, Rothberg v. Rosenbloom*, 808 F.2d 252 (3d Cir.1986) (defense of *in pari delicto* was unavailable to maker and guarantor of note). It is unclear whether the trading at issue actually influenced the price that Anacomp paid for Xidex stock, or otherwise damaged Anacomp, *see Clark*, 915 F.2d 445 n. 9, but this issue was not raised.

changeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its sources are publicly disclosed by press release or otherwise. 17 C.F.R. § 240.14e–3.

Rule 14e–3 creates a duty to disclose material non-public information, or abstain from trading in stocks implicated by an impending tender offer, regardless of whether such information was obtained through a breach of fiduciary duty. *SEC v. Peters*, 978 F.2d 1162, 1165 (10th Cir.1992); *U.S. v. Chestman*, 947 F.2d 551, 557 (2nd Cir.1991).

Maio and Ladavac argue that Rule 14e–3 is void because the SEC exceeded its statutory authority under § 14(e) when, by means of that rule, it created a duty to disclose material non-public information absent a fiduciary duty between the parties to the transaction. In this regard, they rely on decisions which have reasoned that non-disclosure is fraudulent, deceptive, or manipulative only where a fiduciary relationship between the parties to a transaction creates a duty to disclose.[13] In response, the SEC argues that Rule 14e–3 is valid because it is authorized by § 14(e) which grants the Commission power to "define ... such acts and practices as are fraudulent, deceptive, or manipulative" and also power to "prescribe means reasonably designed to prevent ... such acts and practices as are fraudulent, deceptive, or manipulative." *See* 15 U.S.C. § 78n(e).

■ Rule 14e–3 is clearly within the SEC's statutory grant of authority to "prescribe means reasonably designed to prevent ... such acts and practices as are fraudulent, deceptive, or manipulative." *Peters*, 978 F.2d at 1166; *Chestman*, 947 F.2d at 558.[14] The power to define and prescribe means "reasonably designed to prevent" fraudulent, deceptive, or manipulative, acts and practices must extend further than the mere proscription of acts and practices that are in fact fraudulent, deceptive, or manipulative; otherwise this language is superfluous. *Id.* And the Supreme Court has indicated that the SEC's authority extends this far under § 14(e). *See Schreiber*, 472 U.S. at 12, n. 11, 105 S.Ct. at 2464 n. 11. (The last sentence of § 14(e) "gives the [SEC] latitude to regulate *nondeceptive* activities as a 'reasonably designed' means of preventing manipulative acts ...") (quotations in original, emphasis added).[15] Rule 14e–3 is also reasonably designed to prevent fraudulent, deceptive, or manipulative acts or practices after an offeror has taken a substantial step to commence a tender offer. *See Peters*, 978 F.2d at 1166–67 (the Rule dispenses with the difficult task of proving that information was obtained through a breach of fiduciary duty); *Chestman*, 947 F.2d at 558–60 (rule eases evidentiary burden and promotes full disclosure in the tender offer context). Thus Rule 14e–3 is valid and so are the convictions of Maio and Ladavac that result from its violation.

## C. The "Substantial Step" and "Materiality" Challenges

Maio and Ladavac advance two other arguments in their effort to avoid liability. First, they argue that Anacomp did not take a substantial step toward commencing its tender offer until June 14, 1988, when Anacomp

---

13. *See Dirks*, 463 U.S. at 654, 103 S.Ct. at 3261 (insider's nondisclosure is improper only where it breaches his fiduciary duty to the corporation by using corporate information for personal gain); *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) (worker in print shop had no duty to disclose material non-public information concerning impending tender offer to sellers of stock in target company because he had no fiduciary duty to the sellers of those stocks); and *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 12, 105 S.Ct. 2458, 2464–65, 86 L.Ed.2d 1 (1985) (in order for there to be "manipulation" within the meaning of § 14 there must be a misrepresentation or nondisclosure).

14. These cases consider the arguments raised by Maio and Ladavac at length and, to the extent they hold that Rule 14e–3 is a valid exercise of the SEC's statutory authority to prescribe means reasonably designed to prevent fraudulent, deceptive, or manipulative acts or practices, we find their reasoning persuasive. Therefore, we see no need to reiterate their analysis at length.

15. For this same reason, the reliance which Maio and Ladavac place on *Panter v. Marshall Field & Co.*, 646 F.2d 271, 283 (7th Cir.1981), is misplaced, because that case does not discuss the last sentence of § 14e.

and Xidex signed a confidentiality agreement. If so, any trading before that date would not violate Rule 14e–3 which only bars trading after an offeror has taken a *substantial step* to commence its tender offer. For the same reason, they argue that any information they received before June 14, 1988 was not *material* so that trading before that date does not violate Rules 10b–5 or 14e–3 which only prohibit trading on the basis of material non-public information.

### 1. Substantial step requirement of Rule 14e–3.

Rule 14e–3 only bars trading after an offeror has taken a *substantial step* towards commencing its tender offer. *See* 17 C.F.R. § 240.14e–3; *Chestman*, 947 F.2d at 557. The few cases addressing Rule 14e–3's substantial step requirement indicate that this determination, like the materiality inquiry, is to be made on the facts of each case. *See SEC v. Musella*, 578 F.Supp. 425, 443–44 (S.D.N.Y.1984) (retaining a law firm shortly before proposed tender offer is a substantial step); *see also Camelot Industries Corp. v. Vista Resources, Inc.*, 535 F.Supp. 1174, 1183 (S.D.N.Y.1982) (meeting between officers of prospective tender offeror and target corporation was a substantial step in tender offer where prospective offeror stated intent to takeover).

■ Maio and Ladavac argue that Anacomp did not take a substantial step towards commencing its tender offer for Xidex until June 14, 1988, when the parties signed a confidentiality agreement. Any trading before that date would not violate Rule 14e–3. But the district court found that the June 6–7 meeting in Las Vegas between Ferrero and Zaccaria was a substantial step by Anacomp towards commencing its tender offer for Xidex, and that finding is supported by substantial evidence. While it is true that the companies had talked about some form of merger for years, the record shows that the June 6–7, 1988 meeting was much more serious than any previous discussion between the parties. For example, Ferrero was totally unprepared for Xidex's solicitation of some form of buyout by Anacomp in February of 1988, which indicates that this proposal was markedly different from prior and more general discussions concerning some form of affiliation or joint venture. Nonetheless, by March 1988, Ferrero was very interested in acquiring Xidex, and to this end Zaccaria and Ferrero conducted discussions throughout late May. By that time, Xidex officers knew they urgently needed to find a buyer and that a deal with Anacomp was the best possible resolution of their problems. For this reason, Xidex specifically authorized Zaccaria to see if Ferrero was interested in acquiring Xidex and, if so, whether Anacomp could secure financing. Ferrero responded to this request for a definite statement of Anacomp's intent by arranging the June 6–7 meeting in Las Vegas.

■ Thus the June 6–7 meeting was arranged after Xidex had actually solicited Anacomp's tender offer as early February, 1988. The parties had engaged in a series of progressively more serious discussions through late May, and after Xidex had specifically requested that Anacomp determine whether it would make a tender offer and could secure the requisite financing. *See Camelot Industries Corp.*, 535 F.Supp. at 1183 (meeting between prospective offeror and officers of target corporation was a substantial step in tender offer where prospective offeror stated intent to take over target). Further, Anacomp began the due diligence process the day after Ferrero returned from his meeting with Zaccaria. This closeness in time between the meeting in Las Vegas and the beginning of the due diligence process is critically important evidence which confirms that the June 6–7 meeting was more significant than any preceding negotiations. Under these circumstances, we agree with the district court that Anacomp took a substantial step towards commencing its tender offer for Xidex when Ferrero met with Zaccaria in Las Vegas on June 6–7, 1988. The district court's substantial step determination was not clearly erroneous.[16]

16. Since the district court's "substantial step" finding involves the application of a legal standard to a particular set of facts we believe that finding, like a materiality finding, should be reviewed for clear error. *See Ambrosino v. Rod-*

### 2. *Materiality.*

Rules 10b–5 and 14e–3 only prohibit trading on the basis of *material* nonpublic information that is not disclosed before trading. 17 C.F.R. §§ 240.10b–5 and 240.14e–3. Information is material if "a substantial likelihood exists that a reasonable investor would find [it] significant in deciding whether to buy or sell a security, and on what terms to buy or sell." *See Rowe v. Maremont Corp.*, 850 F.2d 1226, 1232–33 (7th Cir.1988), citing *Basic, Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). In *Basic, Inc., supra,* the Supreme Court noted that the materiality of information with respect to contingent or speculative information or events depended "at any given time upon a balancing of both the indicated probability that the [acquisition] will occur and the magnitude of the [acquisition] in light of the totality of company activity." *Basic, Inc.,* 485 U.S. at 238, 108 S.Ct. at 987 (internal quotations and citations omitted). Describing evidence which tended to indicate that merger discussions were significant where information about those discussion would be material, the Court wrote:

> a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels.... We note by way of example that board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest.

*Id.* at 239, 108 S.Ct. at 987.[17] With these principles in mind, we review the district court's materiality determination for clear error. *Ambrosino v. Rodman & Renshaw, Inc.,* 972 F.2d 776, 785 (7th Cir.1992).

Maio and Ladavac argue that Anacomp did not take a substantial step towards commencing its tender offer until June 14, 1988, so that information received from Ferrero prior to that date was not "material"

within the meaning of Rules 10b–5 and 14e–3. But the district court found that information about the June 6–7 meeting between Ferrero and Zaccaria was material. For the same reasons that meeting is properly considered a substantial step by Anacomp towards commencing its tender offer for Xidex, that materiality finding is supported by substantial evidence. Further, there is evidence that Anacomp's acquisition of Xidex, a much larger corporation, was an acquisition of considerable magnitude in light of the totality of Anacomp's corporate activity. *See Basic, Inc.,* 485 U.S. at 238, 108 S.Ct. at 986–87. Also, the trading of Maio and Ladavac tends to show that information about the June 6–7 meeting was material. *See Basic, Inc.,* 485 U.S. at 240 n. 18, 108 S.Ct. at 988 n. 18 (recognizing that trading of this kind is an indication of materiality); *SEC v. Shapiro,* 494 F.2d 1301, 1307 (2d Cir.1974) (immediate trading upon receipt of inside information provides evidence of materiality); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 851 (2d Cir.1968) (evidence of such trading is highly relevant). For these reasons, the district court's materiality determination was not clearly erroneous.

### III. Conclusion

Anacomp took a substantial step toward commencing its tender offer for Xidex when Ferrero met with Zaccaria in Las Vegas on June 6–7, 1988, to discuss that acquisition, and information about that meeting was material non-public information. Thus, Ferrero breached his fiduciary duties to Anacomp when he misappropriated and gifted this material non-public information to Maio, who divulged that information to Ladavac. Maio and Ladavac assumed a fiduciary duty to Anacomp upon receipt of this information because they knew that Ferrero's disclosure was improper. Maio and Ladavac breached their derivative duty to Anacomp when they

---

man & Renshaw, Inc., 972 F.2d 776, 785 (7th Cir.1992).

**17.** In *Basic, Inc.,* the Supreme Court adopted a materiality standard developed under § 14(a) of the Exchange Act of 1934, 15 U.S.C. § 78n(a) and Rule 14a–9, 17 C.F.R. § 240.14a–9, for use when analyzing the materiality of contingent or

speculative events under § 10(b) and Rule 10b–5. *See Basic, Inc.,* 485 U.S. at 232, n. 8, 108 S.Ct. at 983, n. 8. We see no reason why this standard should not also apply to § 14(e) and Rule 14e–3, especially since this case, like *Basic, Inc.,* concerns information about a possible consolidation of corporate entities.

bought and sold shares in Anacomp and Xidex without disclosing the material non-public information in their possession. For these reasons, their sales of stock in Anacomp violated §§ 10(b) and 14(e) of the Exchange Act, § 17(a) of the Securities Act, and Rules 10b–5 and 14e–3; and their purchase of shares in Xidex violated §§ 10(b) and 14(e) of the Exchange Act as well as Rules 10b–5 and 14e–3.

Therefore, we AFFIRM.