In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1091

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RYAN D. EVANS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 928-2—**Milton I. Shadur**, *Judge.*

ARGUED MAY 2, 2006—DECIDED MAY 15, 2007

Before CUDAHY, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Paul Gianamore was a financial analyst at Credit Suisse First Boston, an investment banking firm. He gave information to his friend, Ryan Evans, who traded on that information very lucratively. For their efforts, both men wound up being charged in an eight-count indictment with violations of the federal securities laws. The first time the case went to trial, the jury acquitted Gianamore on all counts, including one that accused him of conspiring with Evans to violate the anti-fraud provisions of the securities laws. The jury also found that Evans was not guilty on the conspiracy charge, but it deadlocked on the substantive securities laws violations. The district court rejected Evans' motion for

acquittal and retried him. The second time around, the jury convicted him on the seven substantive violations of federal securities laws, four of which involved insider trading and three of which charged fraud in connection with a tender offer.

On appeal, Evans argues that as Gianamore's tippee he cannot be convicted because Gianamore (the tipper) was acquitted. He also asserts that the district court gave an erroneous jury instruction on the insider trading counts, that evidence was erroneously admitted, and that without the insider trading convictions his tender offer convictions cannot stand. We conclude that his conviction must be affirmed: Gianamore's acquittal did not foreclose Evans's own liability as a matter of law, and the district court acted within its discretion with respect to its evidentiary rulings and instructions.

## I

Following his graduation from college, Gianamore worked at Credit Suisse First Boston from October 1999 through October 2000, first in Chicago and later in San Francisco. As a financial analyst, he had access not only to his own work but to that of other analysts. In this way, he was privy to information about tender offers and proposed mergers. Tender offers are essentially offers to the shareholders of a targeted company to buy some or all of their stock at a particular price. Credit Suisse helped both buyers and targets to gather information, including nonpublic information, to determine either what price to offer or whether to accept the offered price. Because Gianamore began working at Credit Suisse in the month of October, which was not the company's regular start time for new analysts, he received an abbreviated form of the orientation required for new analysts. As part of that process, he was shown a videotape that covered the

topics of confidentiality and insider trading, and he signed statements on the day he started acknowledging that he had received and reviewed the Credit Suisse Compliance Policy Manual.

Gianamore and Evans were friends. They met as college freshmen at DePaul University in Chicago, although Gianamore moved to New York to attend Cornell after his freshman year. When Gianamore moved back to Chicago, the two resumed their friendship; they talked daily via email or phone and saw each other frequently. Friends of both men testified that Gianamore talked about work, but that his comments were of a general nature. During the first trial, Gianamore's former roommate Mark Hauber also testified that Gianamore talked "in detail" about his work, including specific transactions, and even showed Hauber confidential documents. At the government's urging, the district court excluded Hauber's testimony from the second trial, finding it immaterial to how much information Gianamore shared with Evans and Gianamore's motive for his revelations.

While Gianamore worked at Credit Suisse, Evans traded on three tender offers and one merger in which Credit Suisse was involved between December 1999 and August 2000. Evans used his online brokerage account to make the trades. The first trade involved Jostens, Inc., which hired Credit Suisse to help evaluate a merger offer from Investcorp, SA, a privately held company. In December 1999, Gianamore was assigned to work on this potential transaction. A few days later, Evans bought the maximum amount of Jostens stock he could afford; he raised the funds by selling all of the other securities in his brokerage account. Six days later—the first day of trading after the merger was announced—he sold the shares, making a profit of almost $8,000. This was the smallest of the four trades identified in the indictment, although all four followed the same pattern.

The second trade involved Lincoln Electric Company, a longstanding client of Credit Suisse. During the spring of 2000, Lincoln Electric made a cash tender offer for the outstanding shares of Charter PLC. Although Gianamore himself did not work on this transaction, the analyst on the deal recalled alerting Gianamore to the date on which the press release announcing the tender offer would be issued. Evans bought Charter stock on the very day that the company's board of directors approved the deal and sold it the next day, right after it was announced to the public. In total, Evans made about $244,000 in profit. In the third transaction, Hussman International hired Credit Suisse in April 2000 to evaluate Ingersoll-Rand's offer to buy Hussman's stock. Again, an analyst other than Gianamore had responsibility for the deal. Again, Evans bought his stock on the day the Hussman board of directors met to approve the transaction, and sold it the next day, again following the public announcement. This time Evans made nearly $136,000. Finally, in July 2000, Burns International hired Credit Suisse to evaluate Securitas's tender offer. Gianamore was assigned the project. As before, Evans purchased Burns stock on August 2, 2000, the day the board met and approved the transaction; Evans sold his stock the next day, making $74,714 in profit.

As we noted, the jury at the first trial acquitted Gianamore on all counts and acquitted Evans of conspiracy but not of the substantive offenses. In light of this result, Evans asked the district court to dismiss the insider trading charges against him as well, arguing that he was entitled to prevail as a matter of law in light of the jury's conclusion that neither man had been engaged in a conspiracy. The district court denied that motion and tried Evans a second time. During the second trial, in addition to excluding Hauber's testimony, the district court altered the jury instructions from the first trial, largely because

Gianamore was not a defendant in the second trial. The second jury found Evans guilty of four counts of insider trading in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and three counts of fraud in connection with a tender offer in violation of § 14(e) of the Exchange Act, 15 U.S.C. § 78n(e) (the Williams Act), and Rule 14e-3, 17 C.F.R. § 240.14e-3. Evans was sentenced to 21 months in prison on each count, to run concurrently, as well as a fine of $7,500 and a term of supervised release of three years. He appeals.

## II

We begin with the insider trading violations. Evans's arguments here focus on the legal requirements for a conviction, and thus our review is *de novo*. We must consider what is necessary to convict a person who receives confidential, inside information from someone else and trades upon it—in other words, a tippee. Evans contends that following the acquittal of Gianamore, the alleged tipper, and his own acquittal for conspiring with Gianamore, he cannot possibly be guilty as a tippee. In essence, he argues that the government is estopped from prosecuting him again because the first trial necessarily decided issues that preclude his convictions. He also contends that the jury instructions in his second trial are improper because they fail to require that the tipper have personally benefitted from giving the tippee the information.

Before turning to Evans's individual arguments, it is helpful to review the fundamentals of tippee liability. In *Dirks v. SEC*, 463 U.S. 646 (1983), the government prosecuted an officer of a New York broker-dealer firm who investigated and publicized allegations that Equity Funding of America, a diversified corporation, had vastly

overstated its assets. Neither Dirks nor his firm traded on the information about Equity Funding, but others to whom Dirks spoke during the course of his investigation did. The corporation's stock price fell, leading to a complaint against Equity Funding by the SEC. *Id.* at 649-50. Although Dirks's investigation had brought massive fraud to light and he himself had not traded on insider information, an administrative law judge nevertheless found that he had aided and abetted insider trading. *Id.* at 650-51. Because of his role in bringing far greater misdeeds to light, he was merely censured, but he nonetheless sought review.

In examining the question of tippee liability, the Supreme Court pointed out that insider trading is a crime because of the relation between the insider and the corporation. *Id.* at 653-55 (discussing *Chiarella v. United States*, 445 U.S. 222 (1980)). For this purpose, insiders include corporate officers, directors, or controlling stockholders, all of whom have a fiduciary relation with the corporation. See *Chiarella*, 445 U.S. at 227 (citing *Cady, Roberts & Co.*, 40 S.E.C. 907, 911 (1961)). An insider violates Rule 10b-5 when two elements are established: "(i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure." *Dirks*, 463 U.S. at 653-54 (quoting *Chiarella*, 445 U.S. at 227). In *Chiarella*, the Court had concluded "that there is no general duty to disclose before trading on material nonpublic information, and held that 'a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information.'" *Dirks*, 463 U.S. at 654 (quoting *Chiarella*, 445 U.S. at 235). Instead, the duty arises from the combination of a fiduciary duty and some kind of manipulation or deception. *Id.* As an alternative, the insider always has the option of refraining from trading. *Id.*

Tippees, of course, are not insiders themselves, and so the question has arisen how far the duty either to disclose or to refrain from trading extends to them. This was the subject of the Supreme Court's decision in *Dirks*, where the Court found that "[t]he need for a ban on some tippee trading is clear." 463 U.S. at 659. Critically for Evans's case, it held that "the tippee's duty to disclose or abstain is derivative from that of the insider's duty." *Id.* The Court decided that before tippee liability can exist, there must have been a breach of the insider's fiduciary duty. The test "is whether the insider personally will benefit, directly or indirectly, from his disclosure." *Id.* at 662. "Absent some personal gain," the Court continued, "there has been no breach of duty to stockholders. And absent a breach by the insider, there is no derivative breach." *Id.* at 662. In determining whether there was a breach, the proper focus is on "objective criteria, *i.e.*, whether the insider receives a direct or indirect benefit from the disclosure, such as a pecuniary gain or a reputational benefit that will translate into future earnings." *Id.* at 663. As *Dirks* illustrates, however, the concept of gain is a broad one, which can include a "gift of confidential information to a trading relative or friend." *Id.* at 664 ("The tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient."). Because Dirks was only a tippee and his insider-tippers were motivated not by a desire for personal gain (or even to give a gift) but by a desire to expose fraud, the Court found no liability. *Id.* at 665-67.

The final ingredient of the *Dirks* test focuses on the tippee. As *Chiarella* and *Dirks* itself demonstrate, not all tippees will be liable, no matter how unfaithful the tipper was. Instead, as the Court put it in *Dirks*:

> [A] tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic

> information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee *and the tippee knows or should know that there has been a breach.*

463 U.S. at 660 (emphasis added). See also *SEC v. Maio*, 51 F.3d 623, 632 (7th Cir. 1995); *United States v. Falcone*, 257 F.3d 226, 231-32 (2d Cir. 2001).

Tipper liability (and the tippee liability derived from it), the Supreme Court noted in *United States v. O'Hagen*, 521 U.S. 642 (1997), is a species of the "misappropriation" theory of liability under § 10(b) and Rule 10b-5. See 521 U.S. at 652. Under this theory, "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." *Id. O'Hagen* held that criminal liability under § 10(b) "may be predicated on the misappropriation theory." 521 U.S. at 650.

With these general principles in mind, we turn to Evans's estoppel argument. We begin with a reminder that

> it is well established that "[i]nconsistent verdicts in a criminal case are not a basis for reversal of a conviction or the granting of a new trial." *United States v. Reyes*, 270 F.3d 1158, 1168 (7th Cir. 2001) (collecting authority). This is because the Supreme Court has recognized that inconsistent jury verdicts may occur for various reasons, including mistake, compromise, or lenity. See *United States v. Powell*, 469 U.S. 57, 65, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

*United States v. Askew*, 403 F.3d 496, 501 (7th Cir. 2005). We do not know why the jury in the first trial was not convinced beyond a reasonable doubt that Evans and Gianamore had conspired with one another, or why it chose to acquit Gianamore on the substantive counts. The

important point here is that those acquittals did not prevent a properly instructed second jury from finding both that Gianamore's tips were unlawful and that Evans, by knowingly trading on that information, violated the law. The Supreme Court's decision in *Standefer v. United States*, 447 U.S. 10, 25 (1980), all but forecloses Evans's argument: there the Court held that a defendant accused of aiding and abetting in the commission of a federal offense (making gifts to a public official in violation of 18 U.S.C. § 201(f)) may be convicted after the named principal has been acquitted of the offense.

The Court's holding in *Standefer* that nonmutual estoppel does not apply against the government in criminal cases means, at a minimum, that there was no bar to Evans's second trial on the basis of claim preclusion. We have recognized, however, a narrow version of issue preclusion that may still apply in criminal cases. "[T]he defendants have the burden of proving, based on the indictment, evidence, instructions, and verdict, that the jury's acquittals necessarily determined issues which, on retrial, must be proven beyond a reasonable doubt.*" United States v. Bailin*, 977 F.2d 270, 280-81 (7th Cir. 1992). See also *United States v. Salerno*, 108 F.3d 730, 740-41 (7th Cir. 1997). In *Salerno* and *Bailin*, this court identified three rules governing the application of issue preclusion in criminal cases: (1) the court cannot engage in hyper-technicality, but rather must examine the pleadings, evidence, charge, and other relevant material to determine whether a rational jury could have based its verdict on a different issue; (2) "issue preclusion only applies when a relevant issue in a subsequent prosecution is an 'ultimate issue,' *i.e.*, an issue that must be proven beyond a reasonable doubt"; (3) the defendant bears the burden of proof in proving that the ultimate issue was "necessarily determined by the prior jury." *Salerno*, 108 F.3d at 741; see *Bailin*, 977 F.2d at 280.

Gianamore was acquitted of both conspiracy and substantive violations of the securities laws. To convict on conspiracy, the jury had to find an agreement between the two men and a substantive step in furtherance of the agreement. See *United States v. Soy*, 454 F.3d 766, 768 (7th Cir. 2006); see generally *Whitfield v. United States*, 543 U.S. 209, 214 (2005) (noting that 18 U.S.C. § 371, the general federal conspiracy statute, includes an overt act requirement). Because Evans was also acquitted of conspiracy, we can deduce that the jury either found that the government failed to prove an agreement, or that the government failed to prove that he took the requisite substantive step to implement the alleged agreement. For the substantive securities law violations, the jury was required to find (1) that Gianamore had a relationship of trust with Credit Suisse or its clients, (2) that he breached it by communicating material nonpublic information to Evans in violation of his duty of confidentiality, and (3) that he received a direct or indirect personal benefit, including even a gift. The jury was further required to find that Gianamore acted willfully. Reviewing the jury's verdict and the evidence at trial, one possibility is that the jury concluded that Gianamore had a duty of confidentiality as a corporate insider (derivatively through Credit Suisse), breached it by giving Evans the information as a gift, but did not act with the requisite level of intent nor enter into an actual agreement with Evans. Alternatively, the jury might have found that Gianamore did not receive any benefit from giving out the information, even the benefit of a gift, if he did not think that he was violating clients' confidentiality.

Unlike Dirks, Gianamore was not a whistleblower. Instead, he was an insider acting either carelessly or negligently by giving his friend material insider information that the friend then traded on. It is possible that Gianamore acted without the requisite level of intent to

hold him responsible under the criminal laws and yet that he nevertheless breached the duty of confidentiality he had to Credit Suisse and its clients. From the victim's perspective, the breach is equally damaging whether Gianamore acted willfully or negligently. Where an insider is duped into breaching her duty of confidentiality and the tippee who induces that breach willfully trades on the information, knowing its disclosure to be improper, there is still liability. See 18 U.S.C. § 2(b) ("Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.").

It may be the rare case where the tipper is acquitted and yet the relationship between the tipper and the tippee is such that the tippee may yet be prosecuted for acting upon the tipper's breach. Nonetheless, it is not essential that the tipper know that his disclosure was improper. Where the tippee has a relationship with the insider and the tippee knows the breach to be improper, the tippee may be liable for trading on the ill-gotten information. Thus, where a tippee, for example, induces a tipper to breach her corporate duty, even if the tipper does not do so knowingly or willfully, the tippee can still be liable for trading on the improperly provided information.

Evans bears the burden of demonstrating that the acquittals in the first trial necessarily decided in his favor an issue that was ultimately required to convict him in the second. In our view, he has not done so. The elements of tipper and tippee liability are not the same, as we have already explained. We conclude that the earlier acquittals did not necessarily resolve the question of Evans's liability on the substantive securities law charges.

Next, we turn to Evans's argument that the jury instructions were improper. This court reviews a district court's jury instructions *de novo*. See *United States v. Stewart*, 411 F.3d 825, 827 (7th Cir. 2005).

The court's instructions to the jury must be correct statements of the law that are supported by the evidence. This court reviews instructions in their entirety and considers "whether the jury was misled in any way and whether it had understanding of the issues and [of] its duty to determine those issues." We give deference to the district court's discretion concerning the specific wording of the instructions, as long as the essential elements of the offenses charged are covered by the instructions given.

*United States v. Perez*, 43 F.3d 1131, 1137 (7th Cir. 1994) (internal citation omitted). Evans contends that the district court's jury instruction "eliminated the crucial element that in a tipper-tippee case the tipper must commit a violation of Rule 10b-5."

The jury instruction read as follows:

In considering the element of a "device, scheme or artifice to defraud" for purposes of any of Counts One through Four, then, you must first consider whether Paul Gianamore had a relationship of trust and confidence with Credit Suisse First Boston or its client referred to in the count you are considering, or both. If you so find, then you must next consider whether Gianamore breached that duty by communicating material, nonpublic information to Ryan Evans, in breach of Gianamore's duty to keep such information confidential.

To find that Evans was forbidden to buy or sell the securities in question, you must find that he knowingly participated in such a breach of trust or confidence by the person to whom material, nonpublic, confidential information had been entrusted. Here the government must establish not only that the person from whom Evans allegedly received the information—alleged to have been Paul Gianamore—breached his fiduciary

duty to keep the material, nonpublic information confidential by having disclosed the information to Evans but also that Evans knew or should have known that the person from whom he received the confidential information had breached his fiduciary duty of nondisclosure.

Although this instruction required the jury to find that Evans acted willfully or with knowledge, it did not require the same finding with respect to Gianamore. In addition, this instruction did not ask the jury to consider why Gianamore gave Evans the information. Another part of the instruction, however, explained that "[t]he elements of fiduciary duty and exploitation of nonpublic information also may exist when a person who has insider status as to a corporation makes a gift of material, confidential nonpublic information to a trading relative or friend." This reflects the requirement in *Maio* that, in order to be liable, a tippee must have a derivative duty not to trade on material nonpublic information because the insider's disclosure was improper and the tippee knew or should have known that it was improper. Moreover, this instruction draws a line between an improper disclosure by an insider and a disclosure that is made both willfully and with the expectation of a benefit—both of which must be shown in order for the insider herself to be liable. What this means is that, despite the derivative nature of tippee liability, the elements for tipper and tippee liability differ. Because a tippee can be liable even where the tipper did not act willfully, so long as the tippee knows that the information was provided in violation of a duty of confidentiality, these jury instructions did not mislead the jury and did not eliminate any element necessary for tippee liability.

Finally, we turn to Evans's argument that the district court erred in excluding the testimony of Gianamore's former roommate, Mark Hauber, from the second trial. We

review the decision to admit or exclude evidence for an abuse of discretion. See *United States v. Seals*, 419 F.3d 600, 606 (7th Cir. 2005). Hauber testified at the first trial that Gianamore shared a great deal of confidential information with him and that, for all practical purposes, Gianamore did not understand the nature of confidentiality. The district court excluded Hauber's testimony because it did not shed light on *why* Gianamore gave Evans confidential information or on Evans's state of mind. The district court reasoned that the fact that Gianamore may have breached his confidential relationship more than once did not make each indiscretion less of a breach. The fact that Gianamore may not have acted willfully or criminally does not necessarily mean that Evans failed to appreciate that this information was material and nonpublic, that Gianamore was violating his duty of confidentiality, and consequently that Evans himself had to refrain from trading on the information. Hauber's evidence at most shed light on Gianamore's state of mind, not Evans's, and therefore we cannot find that the district court abused its discretion in excluding it. Furthermore, even if the district court had abused its discretion, any error would have been harmless; in the broader picture, this testimony would have had little impact on the jury.

Evans's challenges to his tender offer convictions are based on the assumption that his insider trading convictions were flawed and must be overturned. Since we have rejected that argument, we do not need to discuss the tender offer convictions any further.

**\*  \*  \***

The judgment of the district court is AFFIRMED.

No. 05-1091                                              15

A true Copy:

    Teste:


               _____
               *Clerk of the United States Court of*
               *Appeals for the Seventh Circuit*