In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 05-2037, 06-1035 & 06-1143

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID GALLARDO, RICARDO GALLARDO
and JORGE LUNA,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 04 CR 50013—**Philip G. Reinhard**, *Judge.*

ARGUED MAY 4, 2007—DECIDED AUGUST 15, 2007

Before POSNER, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* David Gallardo, his brother
Ricardo Gallardo, and Jorge Luna were convicted of
various offenses related to a cocaine and heroin distribu-
tion conspiracy. Together, and individually, they appeal
numerous procedural, evidentiary, and sentencing is-
sues. Finding no error in any of the Appellants' convic-
tions or sentences, we affirm.

## I. BACKGROUND

Michael Fricks was a Rockford, Illinois resident who
law enforcement officers had identified as a drug dealer.

From November 2003 until February 13, 2004, the Drug Enforcement Agency (DEA) had court authorization to intercept phone calls to and from Fricks's cell phone. From evidence gained through those interceptions, agents obtained an interception order for Ricardo's phone from February 2 until February 12, 2004. The DEA's investigation resulted in the arrest of Ricardo, David, Luna, Fricks, Jose Espinoza, and Jerry Wilson. Fricks, Espinoza, and Wilson cooperated with the government and testified at the Appellants' trial.

As part of the drug conspiracy, Espinoza and Ricardo purchased a number of vehicles from James Orsinger with drug trafficking proceeds. While Ricardo purchased the vehicles, Orsinger let him use nominees for the names actually appearing on the titles. Luna agreed to let Ricardo use his name for the title to a 2004 Volkswagen Touareg so that Espinoza and Ricardo could conceal their ownership. Espinoza and Ricardo provided the money for the loan payments on the car and as payment for the use of his name, they paid for a vacation for Luna to Las Vegas.

Espinoza and Ricardo bought the Touareg in order to transport drugs from Mexico to Rockford. They made arrangements with their associates in California to install a secret compartment in the car and asked Luna to drive the car to California for them. Luna agreed; he drove the Touareg to California and flew back to Illinois.

At trial, Espinoza testified that he and Ricardo began selling small quantities of cocaine together in 2000. Initially, they sold as little as one ounce of cocaine at a time, but they quickly ramped up their sales to quarter-kilogram increments. After a short stint in prison, Espinoza returned to Rockford in April 2003, and he and Ricardo began obtaining their cocaine from an organization run by Larry Mendoza. Espinoza and Ricardo used

a truck with a hidden compartment to transport the cocaine. Mendoza, or his associate Tobias Wamsley, would drive the truck to Rockford and deliver the cocaine to either Espinoza or Ricardo. Espinoza or Ricardo would then drive the truck to the home of Connie Gesswein, a woman who agreed to let Espinoza and Ricardo store their drugs in her house if they paid her rent. After selling the cocaine, Espinoza or Ricardo would then use the truck to bring Mendoza his money. Mendoza's organization fronted Espinoza and Ricardo between ten and thirty kilograms of cocaine on between ten and twelve occasions from April 2002 to February 12, 2004.

Rather than selling the cocaine directly to consumers, Espinoza and Ricardo moved the drugs down the distribution chain by fronting them to Fricks, Wilson, and several other individuals. Once these individuals sold the cocaine, they would make payment to either Espinoza, Ricardo, or Ricardo's brother David. Fricks testified at trial that he began obtaining cocaine from Ricardo in early 2002. Between February 2002 and February 13, 2004, Fricks obtained approximately 150 kilograms of cocaine from Ricardo, Espinoza, and David.

Wilson testified that he obtained cocaine from Ricardo between October 2000 and the end of 2001 or the beginning of 2002. He began with quarter-kilogram transactions, but incrementally moved up to full kilogram transactions. Starting in late 2001 Wilson purchased his cocaine from Fricks but began obtaining it directly from Ricardo again in November 2003. Between November 2003 and his arrest on February 12, 2004, Wilson received approximately forty-five to fifty kilograms of cocaine from Ricardo, Espinoza, and David.

On February 12, 2004, Wilson told Ricardo that he had money for him. David went to Wilson's home and retrieved the $15,000 payment. Wilson then talked to Ricardo and

told him that he needed two kilograms of cocaine. Ricardo called David and instructed him to get two of the big bags from Gesswein's and take them to Wilson. Officers watched David retrieve the drugs and drive them to Wilson's apartment in a vehicle registered to Luna.

Later that day, Espinoza and David were together in Espinoza's car when they received a call from Ricardo. Ricardo told them that he was about to be arrested and that they should go to Gesswein's house. Espinoza and David drove to Gesswein's house and picked up six kilograms of cocaine, one kilogram of heroin, and $59,594 in cash. They began to drive to Chicago but were quickly stopped by police and arrested. At the time of their arrest, Espinoza and David were in possession of the garage door opener to Gesswein's house, the garage door opener to Ricardo's house, and a box containing exactly $15,000. At the time that Ricardo was arrested, he was in possession of a cell phone which had been broken in two pieces. That same cell phone had called Espinoza's phone three times between 5:10 p.m. and 6:51 p.m. that day.

Ricardo was charged in Count One with conspiring to possess with the intent to distribute and conspiring to distribute five or more kilograms of cocaine and one kilogram or more of heroin between October 2000 and February 12, 2004 in violation of 21 U.S.C. § 846, in Count Two with distributing over 500 grams of cocaine on February 12, 2004 in violation of 21 U.S.C. § 841(a)(1), in Count Three with possessing with the intent to distribute more than five kilograms of cocaine and more than 100 grams of heroin on February 12, 2004 in violation of § 841(a)(1), and in Counts Five through Twelve with money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B) and 1957.

The jury returned guilty verdicts against Ricardo on Counts One, Two, Three, Nine, Ten, Eleven, and Twelve.

The district court sentenced Ricardo to 360 months' imprisonment, five years' supervised release, and a $500 fine.

Luna was charged in Count One with aiding and abetting the conspiracy, and in Counts Eleven and Twelve with money laundering. The jury returned guilty verdicts against Luna on Counts Eleven and Twelve. The district court sentenced Luna to thirty-three months' imprisonment, three years' supervised release, and a $250 fine.

David was charged in Count One with conspiring to possess with the intent to distribute and conspiring to distribute five or more kilograms of cocaine and one kilogram or more of heroin between October 2000 and February 12, 2004, in Count Two with distributing over 500 grams of cocaine on February 12, 2004, and in Count Three with possessing with the intent to distribute more than five kilograms of cocaine and more than 100 grams of heroin on February 12, 2004.

David pled guilty to Counts One, Two, and Three without a written plea agreement. The district court sentenced him to eighty-seven months' imprisonment, three years' supervised release, a $150 fine, and a $300 special assessment.

## II. ANALYSIS

Ricardo and Luna, together, raise the following issues: (1) whether the district court erred by barring questioning and evidence regarding the prior drug use of witnesses and the effect drug use could have on their memory; and (2) whether the district court erred by denying the defendant's request to inspect extraneous papers in a juror's possession. Luna raises the issue of whether sufficient evidence was presented to support his convictions. Ricardo raises the following issues: (1) whether the district court

improperly allowed evidence of prior bad acts under FED. R. EVID. 404(b); (2) whether the district court improperly allowed an in-court identification of Ricardo by Wamsley; and (3) whether the district court erred in either its calculation of the appropriate Sentencing Guideline range or in arriving at a reasonable sentence. David raises the issue of whether the district court erred by failing to grant him a downward sentencing adjustment for playing only a minor role in the offense pursuant to U.S.S.G. § 3B1.2(b).

## A.  Evidence of Witnesses' Prior Drug Use

At trial, Ricardo sought to offer expert testimony that the past use of cocaine, marijuana and ecstasy by government witnesses would have an adverse effect on their ability to remember the events to which they testified. The government filed a motion in limine to bar Ricardo's expert. The district court explained that defense counsel could only ask the government witnesses whether they were presently addicted to drugs and whether they were addicted to drugs any time between 2000 and 2004. The court reasoned that it was "within its discretion to refuse cross examination on the issue where memory or mental capacity is not legitimately at issue and the evidence is offered solely as a general character attack." Tr. p. 383. The district court relied on this court's opinion in *United States v. Mojica* to find that defense counsel had offered no basis for finding that the witnesses' memory was legitimately at issue. 185 F.3d 780, 788 (7th Cir. 1999). Thus, more extensive cross examination on the subject was prohibited.

The district court also informed defense counsel that they could present extrinsic evidence of the witnesses' drug use during the relevant time periods in their case in chief. Defendants did not present any evidence that any of the

government witnesses were under the influence of drugs during the events to which they testified. As to the defendants' proffered expert, the district court accepted him as a recognized expert, but found that his testimony would not assist the jury in making its decision, particularly because there was no evidence of the witnesses' past drug use or addiction. Additionally, because no evidence of drug addiction was presented to the jury, the district court declined to use the defendants' proposed jury instruction on the effects of addiction.

We review the district court's evidentiary rulings, including limits placed on cross examination, for an abuse of discretion. *United States v. Evans*, 486 F.3d 315, 325 (7th Cir. 2007) (citing *United States v. Seals*, 419 F.3d 600, 606 (7th Cir. 2005)); *Mojica*, 185 F.3d at 788. The district court is empowered to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." FED. R. EVID. 611(a).

"Evidence of a witness' prior drug use may be admitted insofar as it relates to his possible inability to recollect and relate." *Mojica*, 185 F.3d at 788 (citing *United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir. 1992)). There is, however, "considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony." *Id.* at 788-89 (quoting *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987)). Thus, as the district court noted, cross examination on the issue of drug use may be refused "where memory or mental capacity is not legitimately at issue and the evidence is offered solely as a general character attack." *Id.* (citing *United States v. Berry*, 60 F.3d 288, 294 (7th Cir. 1995); *Cameron*, 814 F.2d at 405).

We find no error in the limits that the district court placed on cross examination. Defense counsel was allowed to ask the government's witnesses whether they were currently addicts, and whether they were addicts during the time period about which they testified. The defendants proffered no evidence that the witnesses were under the influence of drugs during the relevant events or that their prior drug use had affected their ability to recall particular events. Furthermore, the defendants did not request that the court *voir dire* the government's witnesses regarding prior drug use. The district court found that the government witnesses had been specific and consistent in their testimony on direct examination and concluded that the witnesses' memory as it relates to drug use was not legitimately at issue. The district court weighed the probative value of the evidence, faithfully applied our decision in *Mojica*, and acted within its discretion to limit cross examination of the witnesses.

We turn next to Ricardo's and Luna's expert testimony argument. The admissibility of expert testimony is governed by FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-92 (1993). Rule 702 allows testimony by a qualified expert if such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. *Daubert* instructs that expert testimony must be relevant and factually linked to the case in order to meet Rule 702's "helpfulness" requirement. *Id.* at 591. It is precisely this factual link that is lacking in this case. The defendants presented no evidence that the government's witnesses were using drugs during the events to which they testified, or that they were ever addicted to drugs. Therefore, expert testimony regarding the effect of drug abuse on one's memory would not help the jury to determine any fact in issue. Furthermore, such expert testimony, without a factual link to the specific witnesses, would intrude upon

the jury's role in assessing witness credibility. *See United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999) ("[T]he credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury—determining the credibility of witnesses.") (citing *United States v. Kime*, 99 F.3d 870, 884 (8th Cir. 1996)). The district court specifically recognized this danger, and properly applied the *Daubert* standard when it excluded the defendants' proffered expert witness. *See* Tr. p. 1143.

Finally, we consider Ricardo's and Luna's argument that the district court erred by refusing to instruct the jury that drug addicted government informers may be especially incredible because of their fear of incarceration and that drug use at the time of an event may impair a witness's recollection of that event. We review the district court's jury instructions *de novo*. *Evans*, 486 F.3d at 324. "The court's instructions to the jury must be correct statements of the law that are supported by the evidence." *Id.* (quoting *United States v. Perez*, 43 F.3d 1131, 1137 (7th Cir. 1994)).

As neither evidence that the government's witnesses were drug addicts, nor evidence of drug use during relevant events was presented at trial, an instruction regarding the effects of current addiction and past incidences of use on witness credibility was not appropriate. Therefore, the district court did not err in refusing to give such an instruction to the jury. *See United States v. Yarbough*, 55 F.3d 280, 284 (7th Cir. 1995).

## B. *Juror's Extraneous Papers*

Ricardo and Luna claim that the district court erred by denying their request to dismiss a juror or to inspect extraneous papers in the juror's possession. There was

much debate between counsel at oral argument regarding the underlying facts of this claim. The juror was reading extraneous papers during the trial. No, he never looked at the papers. The papers were in his hand. No, they were in his pants pocket. No, his shirt pocket. No, his coat pocket. It happened early in the trial. No, it happened late in the trial. None of the parties' counsel accurately recalled the event, and we must rely on what little is found in the record.

On Friday, September 16, 2005, day five of a six day trial, Mr. Price, counsel for Ricardo, addressed the court: "Judge . . . I have an observation. Can I just please tell you at sidebar? We don't need the reporter." Tr. p. 1057. Thus, the record gives no contemporaneous account of what Mr. Price observed. We are puzzled by his suggestion that the documentation of his objection was unnecessary, and we stress the importance of preserving an adequate record for appeal.

Later in the day, Mr. Taylor, Luna's counsel, initiated the following exchange:

> Mr. Taylor: We also need to—I think we need to address the juror that's got the materials that appear not to be materials that—

> The Court: I did look over that way. Let the record show that in one of the sidebars that was not recorded, Mr. Price focused on one of the jurors who had some documents that appeared—he didn't appear to be reading or looking at them, at least to me, during the portion of the testimony. I'm guessing that it's some sort of reading material.

> Mr. Price: Judge, I saw them earlier. They appear to be notebook paper, and when he left, he inserted them in the little book that they're using to keep their notes.

The Court: But that's all right. He might have extra notes.

Mr. Price: That's absolutely possible.

The Court: Those are small notebooks.

Mr. Taylor: Judge, I think we ought to be looking into what he's got. If he's got material that he downloaded off the Internet where he's doing external investigation, then I think we need to know that because I'm not entirely sure that I'm comfortable keeping him as a juror if he's been—if it's reading material, he may not be paying attention to the evidence that's being presented.

The Court: Well, I haven't observed that, but—

Mr. Price: I did see him remove the papers.

The Court: We're only in the last—we're in the last phase here. I'll probably tell them not to bring out any materials that are not materials that are—they're going to use as notebooks.

Government Counsel: As a whole?

The Court: As a whole. I'm not going to single him out. It may be that others have a paper or something like that, meaning a newspaper.

Mr. Price: It could be a love note to his wife.

The Court: That's right. 11:00 o'clock.

Mr. Taylor: For clarity of the record then, my request to ascertain what it is that he's got is denied.

The Court: I'm not going to inquire what he's got. It looks like a couple of pieces of paper that are notebook size paper, and it could be used for that, but to speculate and to single him out, I'll make the statement that I indicated.

Tr. p 1092-94.

After the jury returned to the courtroom, the court stated: "I see some of you are using your notebooks, and it appears that some of you have other papers with you. Does anybody need more notebooks?" Tr. p. 1095. The jurors replied in the negative, and the court stated: "If you've got any other papers, just don't refer to them." *Id.* Later yet that day, Mr. Price and Mr. Taylor reiterated their concerns and moved the district court to dismiss the juror or inspect the extraneous papers. *Id.* at 1128. The court explained that prior to that day, he had not instructed the jurors that they couldn't have extra papers with them in court. Additionally, the court noted that the trial had faced a number of delays, and he couldn't blame a juror who might want to write a letter to a relative or take some notes on his business while not attending to his duties as a juror. *Id.*

The Court Security Officer (CSO) then asked if he could address the court. The CSO explained that a different juror had approached him after the district court had instructed the jurors not to use papers other than their notebooks. The juror explained to the CSO that he had kept the witness list that the court had distributed during *voir dire* when it questioned potential jurors as to whether they knew the witnesses in the case. In response to this information, the court noted that the witness list he distributed was consistent with the papers possessed by the originally complained-of juror. The district court indicated that it would no longer allow jurors to keep such lists. Mr. Price replied: "We live and learn, Judge." *Id.* at 1130. The issue was not discussed further, and it appears that all involved were content with the understanding that the juror had merely retained the witness list and that no harm had resulted.

We review a district court's decision not to hold an evidentiary hearing regarding extrajudicial juror communications for an abuse of discretion. *United States v. Al-*

*Shahin*, 474 F.3d 941, 949 (7th Cir. 2007). Ricardo and Luna argue that under *United States v. Remmer*, prejudice should be presumed in this case and they were entitled to an inspection of the extraneous materials and an evidentiary hearing. 347 U.S. 227, 229 (1954). *Remmer* provides that extrajudicial communications with a juror aimed at influencing the jury's verdict may be presumed to be prejudicial. *Id.*; *Al-Shahin*, 474 F.3d at 949. Such presumption is not conclusive, but the burden rests on the government and the defendant must be fully apprised of the matter at hand. *Remmer*, 347 U.S. at 229; *Al-Shahin*, 474 F.3d at 949.

We have previously held that the *Remmer* presumption was not applicable given the particular facts of a case. *See Whitehead v. Cowan*, 263 F.3d 708, 724 (7th Cir. 2001) ("Even if the *Remmer* presumption applies to jury contacts which do not involve jury tampering, however, we nevertheless conclude that the *Remmer* presumption does not apply on these facts."). *Remmer* itself was addressed to third-party communications with a juror about the matter pending before the jury in an attempt to influence the verdict. 347 U.S. at 229; *Whitehead*, 263 F.3d at 725. The facts of this case do not rise to the level of the misconduct in *Remmer*, and no presumption of prejudice is warranted in this case.

Ricardo and Luna emphasize that because the extraneous materials were not inspected, we have no record of their contents from which to determine prejudice. "While this is indeed cause for concern, it is not necessarily a decisive error. The significance of an off-the-record contact or communication with one or more jurors will vary with the circumstances of each case." *Whitehead*, 263 F.3d at 725 (citing *United States v. Paneras*, 222 F.3d 406, 411 (7th Cir. 2000); *DeGrave v. United States*, 820 F.2d 870, 872 (7th Cir. 1987)). In order for a hearing to be required,

"the extraneous communication to the juror must be of a character that creates a reasonable suspicion that further inquiry is necessary to determine whether the defendant was deprived of his right to an impartial jury." *United States v. Spano*, 421 F.3d 599, 605 (7th Cir. 2005) (quoting *Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005)).

In this case, Ricardo and Luna have not raised a reasonable suspicion that they have been deprived of the right to an impartial jury. Prior to opening statements, the district court instructed the jury that they were only to consider the testimony of witnesses and exhibits presented to them in court. The court further cautioned, "don't do any independent research, don't get on the internet and try to look something up. Don't read, see, or hear anything about the case." Tr. p. 254. The district court did not instruct the jury that they were prohibited from carrying on their persons written materials unrelated to the case. Thus, there is no evidence that the juror had violated any instruction of the court by possessing these extraneous papers.

After being alerted to the defendants' concerns, the district court watched the juror and did not see the juror consult the papers or divert his attention from the trial to the papers. The district court then instructed all jurors, prior to the conclusion of trial, that if they had extra papers with them, they should not refer to them.

We presume that jurors conscientiously follow the district court's instructions. *United States v. Puckett*, 405 F.3d 589, 599 (7th Cir. 2005) (citing *United States v. Linwood*, 142 F.3d 418, 426 (7th Cir. 1998)). "[T]his presumption is only overcome if there is an 'overwhelming probability' that the jury was unable to follow the instruction as given." *Doe v. Johnson*, 52 F.3d 1448, 1458 (7th Cir. 1995); *see Puckett*, 405 F.3d at 599.

Ricardo and Luna offer nothing but speculation in support of their claim. Jurors are not searched for grocery lists, calendars, bus schedules, or love letters prior to service. There is no reason to think that the juror's papers were something more sinister. In fact, the record appears to show a consensus amongst counsel and the court that the papers were most likely just the witness list that the district court had distributed during *voir dire*. There may be cases where extraneous materials not examined at trial should be presumed prejudicial, but in this case, Ricardo and Luna were requesting a fishing expedition without reason to suspect any prejudice. The district court did not abuse its discretion by failing to hold an evidentiary hearing, dismiss the juror, or grant a mistrial.

## C. *Sufficiency of Evidence for Luna's Convictions*

Luna argues that the jury was not presented with sufficient evidence to convict him of two counts of money laundering based on his purchase of the 2004 Volkswagen Touareg. He contends that there was insufficient evidence that he knew that the Touareg was purchased with drug sale proceeds or that the car would be used to facilitate illegal activity.

At trial, the government presented evidence that, once or twice, Luna had received cocaine for his personal use from Espinoza. In December 2003, Luna drove to Ohio to pick up between $40,000 and $50,000 in cash from some of Espinoza's cocaine customers. According to Espinoza, Luna did not want to know what the money was for, but he accepted payment for his services. The trip to Ohio was corroborated by charges to Luna's credit card. Luna also had contact entries in his cell phone associated with Espinoza, Ricardo, and David.

The government intercepted several telephone calls between Luna and Ricardo in February 2004 shortly before their arrests. In these calls, Luna and Ricardo discussed purchasing a 2004 Volkswagen Touareg from James Orsinger. Ricardo gave Luna instructions regarding the purchase. After the Touareg was purchased, Luna and Ricardo discussed Luna driving the car to California. Ricardo provided Luna with the name and phone number of the person receiving the car and directed Luna to fly back from Los Angeles. Luna called Ricardo when he had successfully delivered the car.

Luna also agreed to have a GMC Yukon titled in his name, which was used by David to deliver two kilograms of cocaine on the day of his arrest. Luna suggested to Ricardo that they should purchase insurance for the Yukon so that Ricardo would not get a ticket if he were pulled over. Ricardo told Luna that he wanted to change the name on the Yukon's title to reduce the connections to Luna.

Luna agreed to speak with officers after his arrest. He told contradictory tales, first that he drove the Touareg to California with a friend who was giving the car to his ex-wife, then that a man named Jose Martinez had given the car to Luna in exchange for sexual favors and that the two men drove the car to California together.

Luna was convicted of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B) and 1957(a). The district court accurately instructed the jury on the law. Section 1956(a)(1)(B) required, as relevant here, that Luna engaged in the transaction "knowing that the property involved . . . represent[ed] the proceeds of" illegal drug sales. Similarly, § 1957(a) required that Luna "knowingly engage[d] . . . in a monetary transaction in criminally derived property." Thus, the government was required to prove that Luna either had actual knowledge that the

funds used to purchase the Touareg came from the distri-bution of controlled substances, or that he consciously avoided obtaining such knowledge. *United States v. Carani*, ___ F.3d ___, No. 06-2007, 2007 WL 1946850, at *5-6 (7th Cir. July 6, 2007); *United States v. Carrillo*, 435 F.3d 767, 780 (7th Cir. 2006).

The burden that faces an appellant challenging the sufficiency of the evidence presented to a jury is an "uphill battle" and "nearly insurmountable." *United States v. Sanchez*, 251 F.3d 598, 601 (7th Cir. 2001); *United States v. Szarwark*, 168 F.3d 993, 995 (7th Cir. 1999) (quoting *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)). We "view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution and uphold the verdict if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Hicks*, 368 F.3d 801, 804-05 (7th Cir. 2004) (quoting *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001)).

Viewing the evidence in the light most favorable to the government, a rational jury could have found that Luna knew the money with which he purchased the Touareg was derived from criminal activity, and specifically from the distribution of controlled substances. Luna's two convictions for money laundering are supported by suf-ficient evidence.

### D.  Evidence of Ricardo's Prior Bad Acts

Ricardo argues that the district court erred by admitting evidence of a prior bad act that was inadmissible under FED. R. EVID. 403 and 404(b). The government presented testimony at trial that during a traffic stop in Washington state, Ricardo had represented himself as Luis Torres and had provided the officer with a fraudulent driver's license in that name.

Count One of the superseding indictment alleged that Ricardo and his co-conspirators "used surveillance and counter surveillance techniques, and other means to avoid detection and apprehension by law enforcement authorities," in furtherance of a drug conspiracy. The district court allowed the evidence, concluding that it was both relevant and direct evidence of a crime charged and that the prejudicial effect of the evidence did not substantially outweigh its probative value. The district court did, however, issue a limiting instruction to the jury that the evidence was not presented to show that Ricardo committed a crime simply by using a fraudulent driver's license.

We review the district court's evidentiary rulings for an abuse of discretion. *Evans*, 486 F.3d at 325. The district court, in this case, was well within its discretion to allow the evidence of Ricardo's false representations. The traffic stop occurred on May 6, 2002. The superseding indictment alleged that the conspiracy began in October 2000 and continued through February 12, 2004, putting the traffic stop squarely within the course of the conspiracy. As the district court concluded, the testimony was relevant and direct evidence of the conspiracy as alleged in Count One of the indictment.

### E.  *Wamsley's In-Court Identification of Ricardo*

Ricardo argues that the district court erred by allowing Wamsley's in-court identification of Ricardo to stand over defense objection when Wamsley first stated that he did not see Ricardo in the courtroom. The following exchange took place between the government and Wamsley:

> Government Counsel: Do you see the man you just named as Ricardo in court today?

Wamsley: No, I don't see him, unless he grew his hair out. That's him in the glasses.

Government Counsel: Describe what you mean glasses.

Wamsley: The guy with the—

The Court: Can you point him out?

Wamsley: The dark-haired one with the glasses.

The Court: Identify what he's wearing.

Wamsley: He's wearing a shirt like mine.

Government Counsel: May the record reflect the in-court identification of the defendant Ricardo Gallardo?

The Court: It may.

Tr. p. 662. The district court overruled an objection by Ricardo's counsel, and advised counsel that he could cross examine the witness on the subject. None of the defense counsel cross examined Wamsley about the identification.

Once again, we review the district court's evidentiary rulings for an abuse of discretion. *Evans*, 486 F.3d at 325. The record does not reveal anything improper. At worst it demonstrates that Wamsley had difficulty expressing himself during his in-court identification of Ricardo. The district court stepped in to aid the witness and there is nothing in the record to suggest that the government did anything improper. The district court did not abuse its discretion by allowing Wamsley's in-court identification of Ricardo.

## F.  Ricardo's Sentencing

Ricardo next argues that the district court improperly determined his base offense level under the Sentencing Guidelines for the drug weight involved and improperly

applied an enhancement for Ricardo's leadership role in the conspiracy. Furthermore, he argues that the district court failed to adequately address the sentencing factors under 18 U.S.C. § 3553(a) and to impose a reasonable sentence.

At sentencing, the district court determined that Ricardo's base offense level was thirty-eight, based upon a quantity of 150 or more kilograms of cocaine. U.S.S.G. § 2D1.1(a)(3)(C)(1). The district court credited the testimony of Espinoza, Wamsley, Fricks, and Wilson as well as the plea agreements of Espinoza and David to determine that the conspiracy involved well over 150 kilograms of cocaine. The district court also found that this amount was corroborated by the cash, vehicles, and other assets of the defendant given that Ricardo did not hold a legitimate job during the course of the conspiracy.

The district court further applied a four-level adjustment for being the organizer or leader of criminal activity involving five or more participants, bringing Ricardo's total offense level to forty-two. U.S.S.G. § 3B1.1(a). The district court found, based upon all of the evidence, that Ricardo controlled David, Luna, and Gesswein. The Guidelines only require that the defendant controlled one other member of the criminal enterprise. *United States v. Blaylock*, 413 F.3d 616, 621 (7th Cir. 2005). The district court considered the direction Ricardo gave to the other actors, his recruiting function within the organization, the nature and scope of the criminal activity, and that he was at the highest level of the organization both in terms of decision-making authority and compensation. *See id.*; *United States v. Sadiq*, 116 F.3d 213, 215 (7th Cir. 1997) ("Factors . . . include whether the person had decision making authority, whether he recruited accomplices, his degree of planning of the offense, the scope of the illegal activity and the degree of control he exercised over others."). Ricardo does not appear to take

particular issue with this enhancement, except that the district court made findings of fact beyond those made by the jury.

Ricardo depicts the sentencing law of this circuit as unsettled and hazy; this is not the case. The district court is first required to correctly calculate the advisory Sentencing Guidelines range, which may include making findings of fact by a preponderance of the evidence. *United States v. Hawkins*, 480 F.3d 476, 477 (7th Cir. 2007) (citing *United States v. Roberson*, 474 F.3d 432, 435 (7th Cir. 2007); *United States v. Caldwell*, 448 F.3d 287, 290 (5th Cir. 2006)). Only if the factual determinations require a particular sentence, or result in a sentence exceeding the statutory maximum, must they be made by a jury beyond a reasonable doubt. *United States v. Booker*, 543 U.S. 220, 259-60 (2005); *Hawkins*, 480 F.3d at 477-78; *United States v. Dean*, 414 F.3d 725, 730 (7th Cir. 2005). Next, the district court must determine what sentence to apply, be it inside or outside of the advisory range, by considering and complying with the standard set forth in 18 U.S.C. § 3553(a). *Hawkins*, 480 F.3d at 477.

"We review the district court's interpretation and application of the Sentencing Guidelines *de novo*, and its findings of fact for clear error." *United States v. Fife*, 471 F.3d 750, 752 (7th Cir. 2006) (citing *United States v. Ellis*, 440 F.3d 434, 436 (7th Cir. 2006)). "A finding of fact is clearly erroneous only if, based upon the entire record, we are left with the definite and firm conviction that a mistake has been committed." *United States v. Chamness*, 435 F.3d 724, 726 (7th Cir. 2006) (citations and quotations omitted).

There was nothing whatsoever erroneous about the district court's finding that the conspiracy involved 150 kilograms or more of cocaine, setting Ricardo's base offense level at thirty-eight. Nor did the district court err, either

in its legal or factual determinations, in applying the four-level leadership enhancement. There was adequate evidence supporting the determination that Ricardo controlled the actions of multiple members of the criminal enterprise. With a total offense level of forty-two and a criminal history category of I, Ricardo's advisory Sentencing Guidelines range was 360 months to life, with a mandatory minimum of 120 months.

This brings us to the district court's application of the factors in 18 U.S.C. § 3553(a) and the reasonableness of the sentence imposed. The district court sufficiently addressed the factors in § 3553(a), noting the serious nature of the offense, the need to deter others, the substantial sentences given to Ricardo's co-conspirators, and Ricardo's clean criminal history and lack of violence. Based upon those factors, the district court determined that a sentence within the advisory Sentencing Guidelines range was appropriate. The district court sentenced Ricardo to 360 months on Counts One, Two, and Three, to 240 months on Counts Nine and Ten, and to 120 months on Counts Eleven and Twelve, with the sentences on all Counts running concurrently. The district court explained that Ricardo's age, lack of criminal history, and lack of violence warranted a sentence at the bottom of the Guidelines range.

The district court is not required to discuss each factor in § 3553(a). "It is enough that the record confirms that the judge has given meaningful consideration to the section 3553(a) factors, and the record supplies us with that assurance here." *United States v. Williams*, 425 F.3d 478, 480 (7th Cir. 2005). Thus, the district court complied completely with the required sentencing procedures.

The only remaining question is whether the sentence was reasonable. The Supreme Court recently upheld a presumption of reasonableness for in-Guidelines sen-

tences on appellate review. *Rita v. United States*, 127 S. Ct. 2456, 2467-68 (2007); *see United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). As our circuit precedent reflects, "[t]he defendant can rebut this presumption only by demonstrating that his or her sentence is unreasonable when measured against the factors set forth in § 3553(a)." *Mykytiuk*, 415 F.3d at 608.

Ricardo cannot meet this burden. He was an organizer of a large-scale drug conspiracy, and he offers nothing to suggest that his sentence offends the § 3553(a) factors. The mitigating factors that Ricardo relies on—his age, lack of violence and criminal history, and the supportive letters from his friends and family—do not outweigh the countervailing factors considered by the district court. The sentence of 360 months, at the very bottom of the advisory Sentencing Guidelines range, was not unreasonable.

## G. David's Sentencing

David argues that the district court erred by failing to grant him a downward sentencing adjustment for playing a minor role in the offense pursuant to U.S.S.G. § 3B1.2(b). At sentencing, the district court found that David played an essential role in the conspiracy. "His role was one of a trusted associate to his brother, who apparently was the highest up person in this conspiracy . . . ." Tr. p. 23. Because of this position, David was entrusted to transfer large quantities of drugs and cash. Furthermore, he was given access to the stash house where the drugs were stored. The district court gave weight to David's limited time spent in the conspiracy, but found that it did not warrant a minor role adjustment, particularly because the conspiracy was cut short only by the members' arrests. While his role was not as great as Ricardo's and Espinoza's, it was nonetheless essential.

Without the minor role adjustment, David's total offense level was twenty-nine. His criminal history category was I, and he was exempted from the 120 month statutory minimum sentence because he qualified under the safety-valve provision. U.S.S.G. § 2D1.1(b)(7) (2004). David's sentencing range was 87 to 108 months. The district court sentenced him to 87 months' imprisonment, to run concurrently with the sentences given on the three Counts to which he pled guilty, followed by three years' supervised release.

As stated previously, we review the district court's interpretation of the Sentencing Guidelines *de novo* and its findings of fact for clear error. *Fife*, 471 F.3d at 752 (citing *Ellis*, 440 F.3d at 436). David's main argument in support of a minor role adjustment is that, in relation to the other members of the conspiracy, he only participated for a short time. So, should the length of David's involvement, only about a month, necessarily entitle him to a two-level downward adjustment?

David's brief engagement in the conspiracy is reflected in his base offense level, but he is not precluded from the adjustment simply because he was held accountable only for the fifteen kilograms of cocaine and one kilogram of heroin that he actually handled. *United States v. Rodriguez-Cardenas*, 362 F.3d 958, 961 (7th Cir. 2004). "However, where each person was an 'essential component' in the conspiracy, the fact that other members of the conspiracy were more involved does not entitle a defendant to a reduction in the offense level." *United States v. McKee*, 389 F.3d 697, 700 (7th Cir. 2004) (quoting *United States v. Castillo*, 148 F.3d 770, 776 (7th Cir. 1998)). Furthermore, David's role should be compared to that of the average member of the conspiracy, not with the leaders, such as Ricardo, who received an enhancement for his organizing role. *United States v. McGee*, 408 F.3d 966, 987 (7th Cir. 2005).

We cannot say that the amount of time David spent in the conspiracy is necessarily determinative on this issue. The district court explicitly considered the length of David's involvement, but nonetheless found that his role was essential to the success and scope of the conspiracy. David handled large quantities of cash and drugs, executed essential deliveries, and his involvement was on par with that of the average member of this conspiracy. The district court did not clearly err by failing to grant the minor role adjustment under U.S.S.G. § 3B1.2(b).

### III. CONCLUSION

For the foregoing reasons, David Gallardo's sentence is AFFIRMED, Ricardo Gallardo's conviction and sentence are AFFIRMED, and Jorge Luna's conviction is AFFIRMED.

A true Copy:

      Teste:

 

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*