In the

# United States Court of Appeals

## For the Seventh Circuit

───────────────

No. 21-2434

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LUIS H. GARCIA,

*Defendant-Appellant.*

───────────────

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cr-00688-1 — **John J. Tharp, Jr.**, *Judge.*

───────────────

ARGUED SEPTEMBER 8, 2022 — DECIDED AUGUST 24, 2023

───────────────

Before WOOD, ST. EVE, and JACKSON-AKIWUMI, *Circuit
Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Luis Garcia provided lo-
gistical assistance while another man unloaded items from a
secret compartment on an empty bus. The items turned out to
be controlled substances. Based on his involvement in the af-
fair, Garcia was convicted of possession with the intent to dis-
tribute controlled substances, and conspiracy to do the same.
On appeal, Garcia raises two issues stemming from his trial.

First, he challenges the district court's denial of his motion for a judgment of acquittal. The court rejected his argument that, although he may have known the bus contained unspecified contraband, the government failed to prove that he knew the contraband was drugs specifically. Second, he challenges the court's denial of his motion for a new trial based on notes that jurors submitted to the court during trial. The notes, Garcia argues, suggest jurors were deliberating prematurely and otherwise not following the court's instructions.

We affirm. When viewed in the light most favorable to the government, there was evidence that Garcia knew the bus contained controlled substances. And although the multiple juror notes show something strange was happening with the jury, we cannot say the district court abused its discretion concluding that the strangeness did not rise to the level of misconduct.

I

**A. The Offense**

The events underlying Garcia's prosecution took place over a weekend in November 2017 at a truck wash run by Francisco Navarro. On Friday, a business associate told Navarro that someone with the pseudonym "Polivoz" would contact Navarro to coordinate receipt of a shipment of drugs from Mexico. Later that day, Garcia introduced himself as "Polivoz" to Navarro. Garcia told Navarro that Garcia needed to use the garage at the truck wash to park and unload an intercity coach bus, which Navarro understood would be carrying drugs. Garcia said it would take all night to unload the

bus and that during that time only Garcia and the person who arrived with the bus could access Navarro's garage.

Meanwhile, Luis Espindola-Michel was traveling from Mexico to Navarro's garage on the bus. His job was to unload the drugs from the bus. They were hidden in secret compartments ("traps") on the sides of the bus between the walls and the ceiling. Accessing the traps was a time-consuming process; someone had to remove all the seats on the bus by hand and then remove the metal plates covering the traps.

Later on Friday, when the bus arrived at Navarro's garage, Garcia was there to meet it. After Navarro and his employees left, Espindola began dismantling the bus to access the traps. Garcia was not allowed on the bus to see how the traps worked, but he helped Espindola by bringing him tools, food, and luggage to transport the contents of the traps. Ultimately the project took longer than expected; Espindola worked overnight and into early Saturday morning.

When Navarro showed up to his garage Saturday morning, he did not expect to find the bus still there. The prosecutor asked Navarro what he asked Garcia after seeing that the bus was still there:

> Q. [D]id you have another conversation with the defendant?
>
> A. Yes.
>
> Q. And what did you discuss with him?
>
> A. About the same thing. He needed more time because he had not been able to remove the drugs.

Espindola completed unloading the drugs later that morning and then needed a way to deliver them for a sale. He told Garcia that he (Espindola) wanted to purchase a car with the proceeds of the sale of the unloaded items. Garcia then arranged for Espindola to buy a car without any down payment. On Saturday afternoon, Espindola used that car to sell some of the drugs from the bus. As it turned out, the customer was an undercover law enforcement officer who arrested Espindola.

Espindola eventually agreed to cooperate and made recorded phone calls. One of the calls was to Garcia, who at this point believed that law enforcement was merely trailing Espindola. Garcia told Espindola to "relax" because the just-purchased car, Garcia believed, no longer contained the cargo unloaded from the bus. Espindola responded by expressing concern that the luggage with the remaining drugs was still on the bus. Garcia then wanted to clarify whether the luggage was inside the bus, as opposed to the garage, because if it was in the bus it was locked up where no one could see it. At the end of the call, Espindola asked Garcia to go back to the bus to get a backpack containing Espindola's clothes. Garcia responded, "Screw that, right now we cannot go near there."

The next day, Sunday, Navarro needed to get a customer's car out of the garage. Navarro coordinated with Garcia, who was skeptical about going back to the garage because the area was "hot," referring to law enforcement. Indeed, as Navarro testified at trial, Garcia did not want Navarro to go back because the drugs were still there:

> Q. What did you discuss with [Garcia] on the phone?

A. Well, he was not in agreement that I take the car out from there.

Q. Okay. So did you tell the defendant that you needed to go in and get the car?

A. Yes.

…

Q. Do you remember what he said?

A. Yes.

Q. What did he say?

A. That the drugs had been lost, that he did not know what was happening, that it was not a good thing for me to go back into that garage.

On Sunday evening, law enforcement obtained a warrant, entered the garage, searched the bus, and seized the remaining drugs. A grand jury indicted Garcia with conspiring to possess and to distribute heroin and methamphetamine, *see* 21 U.S.C. § 846, and with possessing the same drugs with intent to distribute, *see id.* § 841(a)(1).

At trial, the government introduced testimony from Navarro and Espindola, who had agreed to cooperate as part of their plea deals. The government also introduced recordings and transcripts of Garcia's calls and text messages, along with Garcia's phone records—which showed he had frequent contact with Espindola, Navarro, and other members of the conspiracy during the relevant dates. Garcia rested without presenting any evidence and moved for a judgment of acquittal.

*See* FED. R. CRIM. P. 29. The district court summarily denied Garcia's motion.

## B. The Juror Notes

The district court began the trial with a lengthy set of instructions for the jury. Part of those included admonitions forbidding the jury from discussing the case with anyone—including their fellow jurors—until deliberations began. The court reminded the jurors of this prohibition before every break during the trial.

Over the course of the three-and-a-half-day trial, the court received four notes from jurors. The first note was from Ms. Mantis, an alternate juror, who submitted it on the first day of evidence. She wanted to hear Garcia's voice to know what he sounded like and what mannerisms he used: "[C]an we hear Garcia speak before watching videos to know what he sounds like? … [T]o the defendant's lawyer: How would you know about his mannerism if he doesn't talk at least to us?" The court solicited the parties for suggestions on how to respond to Mantis's note but deferred deciding until the next day.

The following morning (day two of evidence), the court sent a note to only Mantis saying that the court cannot comment on the evidence: "The Court has received your note but cannot comment on or respond to your questions. The jury's verdict may be based only on the evidence introduced at trial and the instructions of law that the Court provides."

Later that day, Mantis submitted her second note. She asked if a witness had forged his signature on one of the exhibits the government had entered. "Obviously," the court commented to the parties outside the presence of the jury, "Mantis did not get the message … ." The parties agreed the

best approach would be to repeat the first message—that the court could not comment on the evidence—but this time to the entire jury.

The court did so the next day (the third and final day of evidence). Later that day, Ms. Barter, a different juror, submitted a note. Her note concerned the fact that Garcia used the pseudonym "Polivoz," but there was another person involved in the operation with a similar name: "Polo." Barter worried there might be confusion caused by the similar monikers:

> This is a question in regards to yesterday's witness. The jury got a quick explanation that "Polo," another individual involved in the crime, has the same name as the defendant, Luis Garcia. This occurred when the evidence of the photograph of "Polo" was projected towards the jury and the witness on the stand answered that "Polo" was Luis Garcia. *We would, I would* want to make sure that everyone is aware that that is irrelevant towards the evidence with the defendant's name listed on paper. Is there a way that could be clarified?

(emphasis added). At this point, the district judge was a little exasperated when he spoke with the parties about the note:

> I am more concerned about the evolving pattern here. … I never received a note from a juror in any trial I participated in directly or as a judge where the juror was asking or making substantive commentary on the evidence entered. So I don't know why we're having this phenomenon

> in this trial. Every response we have given has been calculated to try to stop that, but apparently even the admonition this morning was not enough.

Garcia worried that the use of the word "we" indicated that the jurors had been discussing the case. The government agreed that this was a concern. So, the court repeated to the entire jury both admonitions that the court cannot comment on the evidence and that jurors were forbidden from deliberating until the close of the evidence.

But later that day, Mantis—the alternate juror and author of the first two notes—submitted her third note. This time, she shared that she saw an interaction between Garcia and a witness right after the witness had finished testifying. At this point, Garcia sought to remove Mantis from the jury. The government did not object, and the court granted the motion because, it said, "She clearly doesn't get it."

After closing arguments, the jury began deliberations. About fifty minutes later, the jury submitted a note saying they needed technological support, and court staff assisted. Nearly three hours after deliberations began, the jury sent a note saying they had reached a verdict. The jury found Garcia guilty of both counts. The jury specifically found that Garcia's possession, and the conspiracy, involved one or more kilograms of heroin and fifty or more grams of methamphetamine.

Garcia later moved for a new trial, *see* FED. R. CRIM. P. 33, arguing that the use of the word "we" in the third juror note, coupled with the short length of deliberations, meant that the

jury had prematurely deliberated and deprived Garcia of a fair trial.

The district court denied this motion. First, the court found that the use of the word "we" did not necessarily mean the jury had prematurely deliberated. Other explanations included the possibility that the single juror speculated that other jurors might be confused about the pseudonyms or that a few jurors had expressed that confusion. The court reasoned that it required too great a leap from either scenario to conclude that the jury had begun debating the merits of the case. Second, even if premature deliberations had happened, that would not be grounds for a new trial because Garcia was not prejudiced. The note, the court reasoned, actually helped Garcia because it caused him later that day to enter a stipulation, to which the government agreed, clearing up any confusion about the difference between Polivoz and Polo. The court also rejected Garcia's argument that the jury deliberations were too fast.

## II

Under our de novo review of a defendant's motion for a judgment of acquittal, we look at the trial record in the light most favorable to the government and ask whether any rational trier of fact could have found, beyond a reasonable doubt, the essential elements of a crime. *United States v. Armenta*, 883 F.3d 1005, 1008 (7th Cir. 2018). An essential element of possession with intent to distribute and a related conspiracy is that defendants must know that what they are possessing, or the object of the conspiracy into which they have entered, is a controlled substance. *United States v. Hamdan*, 910 F.3d 351, 356 (7th Cir. 2018) (citing *McFadden v. United*

*States*, 576 U.S. 186, 188–89 (2015)) (possession); *United States v. Garcia*, 580 F.3d 528, 535 (7th Cir. 2009) (conspiracy). (For the sake of simplicity, we refer only to conspiracy, but our analysis applies to the possession charge as well.) In this circuit, the government must provide evidence that the defendant knew the object of the conspiracy was related to a controlled substance specifically, as opposed to a generalized or some other illicit purpose. *See United States v. Cardena*, 842 F.3d 959, 995 (7th Cir. 2016); *United States v. Salinas*, 763 F.3d 869, 877 (7th Cir. 2014); *accord United States v. Sliwo*, 620 F.3d 630, 633–34 (6th Cir. 2010).

Thus, the issue on appeal is whether the government introduced enough evidence for a rational jury to conclude that Garcia knew he was conspiring to possess and distribute drugs, not just something illegal. In a controlled-substances prosecution, the government can meet its burden of production with evidence of conversations that suggest the defendant knew the goal was related to drugs plus other suspicious behavior that can be connected to drug trafficking. In *Cardena*, the defendant made a nearly identical argument to the one Garcia makes: He argued that there was insufficient evidence that he knew he conspired to steal cocaine, as opposed to just conspiring to steal something. 842 F.3d at 995. We rejected this argument because the defendant previously had two conversations—one with co-conspirators (where they told him the group would be stealing drugs) and one with a law enforcement officer (where he admitted to stealing drugs). *Id.* This was enough for a jury to conclude that the defendant knew the object of the conspiracy was drugs. *Salinas* provides another example. There, law enforcement pulled over a defendant and found cash in hidden compartments in a tractor trailer. 763 F.3d at 873–74. The defendant argued that the

government failed to prove the money was linked to controlled substances. *Id.* at 878. We concluded the government's evidence was sufficient because of the defendant's communications with a known drug trafficker and expert testimony that the specific method the defendant used to hide the money was often used by drug traffickers. *See id.*

Turning to the facts of this case, two pieces of evidence show Garcia knew the object of the conspiracy was drugs, as opposed to some general illicit end. First, the day the bus arrived, Garcia told Navarro that he would need Navarro's garage only for that night. Come the next morning, the bus was still there, and Navarro testified that Garcia said "[h]e [referring to either Garcia or Espindola] needed more time because he had not been able to remove the drugs." Second, the next day, an unrelated customer needed to get a car out of the garage, but Garcia would not let Navarro get the car for the customer. Navarro summarized Garcia's refusal by testifying that Garcia explicitly mentioned drugs: "[Garcia said t]hat the drugs had been lost, that he did not know what was happening, that it was not a good thing for me to go back in that garage." Garcia grapples with only the first quote and dismisses it by arguing that it was ambiguous whether Garcia said the word "drugs" or if Navarro assumed that Garcia knew it was drugs and then Navarro added an appropriate gloss to his testimony. We, however, review the evidence in the light most favorable to the government, *Armenta*, 883 F.3d at 1008, and thus must assume that Garcia, at least twice, explicitly acknowledged that he knew there were drugs on the bus. *See Cardena*, 842 F.3d at 995.

Once we assume that these two conversations were about drugs, there was enough evidence for a reasonable jury to

convict Garcia because the government's evidence also showed other suspicious activity. Garcia took over a garage of a person he had just met, and assisted Espindola through-out the night by providing tools, food, and luggage while Espindola unloaded items stashed in hidden panels of the bus. Garcia also helped secure a car for the first "sale" of the unloaded items. And after he learned that Espindola had in-teracted with law enforcement, Garcia refused to let anyone go near or into the garage because the place was "hot," refer-ring to law enforcement. And during this entire time, he was in constant communication with several people who orches-trated the transport or sale of illegal drugs. *See Salinas*, 763 F.3d at 878.[1]

### III

The second issue Garcia argues on appeal is that the dis-trict court abused its discretion in denying his motion for a new trial based on potential premature jury deliberations. *See United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019)

---

[1] The government stressed in its brief and oral argument that another suspicious fact the jury could have relied on was the fact that the bus came from Mexico, "a country," as the government put it, "commonly known as a source of narcotics." But plenty of legal products are shipped across the Mexican border. *See generally* BUREAU OF INDUSTRY & SECURITY, U.S. DEP'T OF COM., U.S. TRADE WITH MEXICO 3 (2021), https://www.bis.doc.gov/index.php/documents/technology-evalua-tion/ote-data-portal/country-analysis/3028-2021-statistical-analysis-of-u-s-trade-with-mexico/file (listing top imports from Mexico, including ma-chinery and agricultural products). The government's argument does not fare better if we assume that Garcia knew something illegal was afoot: The fact that illegal contraband from Mexico could be (or even most likely could be) controlled substances is not enough alone to infer beyond a rea-sonable doubt that it was drugs.

(motions for a new trial reviewed for abuse of discretion). Criminal defendants have the right to a trial by "an impartial jury." U.S. CONST. amend. VI. Premature deliberations risk the jury losing that impartiality, *United States v. Morales*, 655 F.3d 608, 632 (7th Cir. 2011), and that loss would be grounds for a new trial, *see United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); FED. R. CRIM. P. 33(a). Garcia points to three parts of the trial that he believes definitively showed the jury deliberated prematurely:

1. Four total notes from the jury asking the district judge to comment on the evidence, even though, after every note, the judge said he cannot do that;

2. The use of the word "we" in the third note, suggesting that the jury had discussed the evidence and was confused about a part of it; and

3. The government's and judge's concession that this repeated and unprecedented inability to understand instructions may suggest the jurors were deliberating.

When determining if the jury deliberated prematurely, we must start with the presumption that it did not. The court opened the trial with a lengthy admonition to the jury not to discuss the case with anyone, including their fellow jurors, until deliberations began. The court then repeated this prohibition before every break throughout the trial. There is a rebuttable presumption that the jury followed these instructions. *United States v. Marchan*, 935 F.3d 540, 548 (7th Cir. 2019).

Although we, like the district court, agree that something exceedingly unusual happened during the trial, there is not enough evidence to rebut the presumption under our court's demanding standard. A defendant can overcome the presumption by showing there is an "overwhelming probability" that the jury did not or could not follow an instruction. *United States v. Gallardo*, 497 F.3d 727, 736 (7th Cir. 2007). Garcia is correct that Barter's use of the word "we" *could* suggest the jury had discussed the case. There is, however, an alternative, equally plausible explanation: Barter was confused and merely expressed worry that her fellow jurors would be confused too. We do not suggest that this alternative explanation is what in fact happened. Rather, it is plausible, and the existence of a plausible alternative makes it impossible to find an "overwhelming" case of premature deliberations.

We have held before that a plausible alternative explanation does not overcome the presumption that the jury did not follow instructions. In *Gallardo*, defense counsel pointed out that one juror had a noticeable number of documents with him in the courtroom. *Id.* at 734. Counsel worried that they could be external material about the case or irrelevant reading material, distracting the juror. *Id.* The district court denied counsel's request to dismiss the juror or inspect the papers and instead instructed the jury that the only papers they could possess were their trial notes. *Id.* at 735. This court affirmed, concluding that the evidence was not overwhelming because defense counsel had nothing but speculation that the juror's documents were problematic. *Id.* at 736. They could have easily been "grocery lists, calendars, bus schedules, or love letters." *Id.*

To be sure, Barter's use of the word "we" did not occur in a vacuum: Besides her note, there were three other episodes of another juror's inability to follow rules, and all of this kept happening right up until the end of trial. (Indeed, the district court and the government both conceded at trial that the continued confusion suggested the possibility of premature deliberations.) But again, our standard is a demanding one—we have held that even stronger evidence suggesting multiple instances of rule breaking was insufficient. In *Morales*, a juror submitted a note disclosing that other "loud and boisterous jurors [were] making remarks about witnesses and [attorneys] and discussing the case. Jokes and other inferences about the case were made." 655 F.3d at 629 (cleaned). The district court denied defendant's motion for a mistrial, and we affirmed because the juror's note did not reveal the details of the discussion: The "note only suggested the possibility of premature deliberations (as opposed to jokes, idle comments, or other generalized discussions)." *Id.* at 632; *accord United States v. Baker*, 899 F.3d 123, 131–32 (2d Cir. 2018). Thus, even in a case where a juror had evidence suggesting other jurors had not followed instructions several times, the evidence's slight ambiguity was enough to have the presumption hold.

Garcia also argues that the relative speed of the jury's deliberations is evidence of premature deliberations. The jury deliberated at most three hours, but potentially less if one discounts time for the technical difficulties the jury encountered. True, we have dicta that the speed of deliberations can be a factor in deciding whether to grant a new trial. *See United States v. Cunningham*, 108 F.3d 120, 123–24 (7th Cir. 1997). But Garcia skips a step. The speed of deliberations can be evidence that a defendant was prejudiced by a jury's failure to follow instructions. *Id.* at 124. This, in turn, requires some

predicate misconduct by the jury, *see id.*, of which there is insufficient evidence in Garcia's case, as we have explained.

In sum, we presume the jury followed the instructions not to deliberate prematurely because the juror notes, while troubling, are not "overwhelming" evidence that would overcome the presumption. Accordingly, we cannot say the district court abused its discretion in concluding that the jury did not engage in misconduct.

**IV**

The district court properly denied both Garcia's motions for a judgment of acquittal and a new trial. Therefore, we AFFIRM the district court's judgment.